CENTER FOR BIOLOGICAL DIVERSITY, Plaintiff,

v.

Robert B. PIRIE, Jr., Acting Secretary of the Navy; Donald H. Rumsfeld, Secretary of Defense, Defendants.

No. CIV.A. 00–3044(EGS).

United States District Court, District of Columbia.

March 13, 2002.

**163**

Mark L. Stermitz, Esquire, U.S. Department of Justice, Environment and Natural Resources Division, Washington, D.C., for Robert B. Pirie, Jr.

Mark L. Stermitz, Esquire, U.S. Department of Justice, Environment and Natural Resources Division, Washington, D.C., Roger Michael Golden, Fenwick & West, L.L.P., Washington, DC, for Donald H. Rumsfeld.

Paul Douglas Kamenar, Washington Legal Foundation, Washington, DC, for Washington Legal Foundation.

Howard I. Fox, Esquire, Earthjustice Legal Defense Fund, Washington, D.C., Paul H. Achitoff, Earthjustice Legal Defense Fund, Honolulu, HI, John Andrew Fritschie, Washington D.C., for Center for Biological Diversity.

## MEMORANDUM OPINION AND ORDER

SULLIVAN, District Judge.

Plaintiff Center for Biological Diversity (CBD) filed this lawsuit to prevent the use by the United States military of live fire training exercises on the island of Farallon de Medinilla (FDM) because such exercises allegedly kill and otherwise harm several species of migratory birds without a permit, in violation of the Migratory Bird Treaty Act (MBTA), 16 U.S.C. § 703 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.* Defendants, the Secretary of Defense Donald Rumsfeld and the acting Secretary of the Navy, Robert Pirie, have been sued in their official capacity as the heads of the branches of the military that engage in these exercises on FDM.

The case comes before the Court on the parties' cross motions for summary judgment. Plaintiffs argue that defendants' decision to continue these training exercises. in light of evidence of bird deaths known to defendants and in light of the Fish and Wildlife Service's (FWS) denial of defendants' request for a MBTA permit, violates the provisions of the MBTA and consequently the APA's prohibition on unlawful agency action. Plaintiffs ask the Court to enjoin the military exercises on this island unless and until defendants obtain a proper permit for their actions. Defendants respond with several arguments. First, defendants challenge plaintiffs' standing. Second, defendants argue that

regulation of the unintentional impact on migratory birds is an area properly left to prosecutorial discretion under the MBTA and is therefore an unreviewable discretionary action for purposes of the APA. Third, defendants argue that plaintiffs have identified no final agency action and therefore can not prove a violation of the APA. Finally, defendants strongly emphasize the uniqueness and importance of these training exercises to the preparedness of the military in the entire Pacific region, and argue that even if this Court finds a violation of the APA, an injunction should not be issued because the public interest in continuing these exercises outweighs any harm to the migratory birds.

Upon consideration of the parties motions, responses and replies thereto, the oral arguments of counsel at the hearing on March 13, 2002, and the applicable statutory and case law, the Court has determined that defendants have violated and continue to violate the MBTA and the APA by killing these birds without a permit. Therefore, plaintiffs' motion for summary judgment as to liability is **GRANTED** and defendants' motion for summary judgment is **DENIED**. Because the issue of the proper remedy to be imposed by this Court deserves further attention, the Court has set forth questions for the parties to brief at the conclusion of this opinion and has scheduled a hearing to discuss the proper remedy on April 30, 2002.

## BACKGROUND

### I. *FDM and Migratory Birds*

The island of FDM is located approximately 45 nautical miles northeast of Saipan in the Commonwealth of the Northern Marianas Islands. The island is approximately 1.7 miles long and 0.3 miles wide, with a total area of about 206 acres. FDM is composed of volcanic rock, and consists

of hilly plateaus with dramatic cliffs dropping as much as 328 feet to the ocean on all sides. Although uninhabited by humans, FDM is home to many species of birds and animal life. The island is covered by diverse vegetation, that provides shelter, foraging, roosting, and nesting for several species of migratory birds. Surveys conducted in the 1980s and 1990s confirmed the presence of great frigatebirds (*Fregata minor*), masked boobies (*Sula dactylata*), brown boobies (*Sula leucogater*), red-footed boobies (*Sula sula*), sooty terns (*Sterna fuscata*), brown noddies (*Anous stolidus*), black noddies (*Anous minutus*), fairy terns (*Gygis alba*), cattle egrets (*Bubulcus ibis*), red-tailed tropicsbirds (*Pheathon rubricauda*), white-tailed tropicsbirds (*Phaeton lepturus*), Pacific golden plovers (*Pluvialis fulva*), whimbrels (*Numenius phaeopus*), bristle-thighed curlews (*Numenius tahitiensis*), and ruddy turnstones (*Arenaria interpres*). See Plf' Mem. in Supp. of Mot. for Summ. J., Ex. 2 ("Historical Overview of Farallon de Medinilla: 1543 to 1997," attached as an exhibit to the Volume Two of the U.S. Pacific Command, Final Environmental Impact Statement, "Military Training in the Marianas").

The number of birds of each species found on FDM ranges from a handful to the thousands, and varies throughout the year. *Id.* Most of the bird species use the island for breeding. Each breeding colony can serve the seabird population from tens of thousands of square miles of surrounding ocean. *Id.* In particular, FDM is one of only two great frigatebird breeding colonies in the Mariana island chain, and is the largest known nesting site for masked boobies in the Mariana and Caroline islands. *Id.* In addition, FDM is home to an endangered nonmigratory flightless bird, the Micronesian megapode.[1]

1. The nonmigratory megapode is covered by      the Endangered Species Act (ESA) rather

## II. *Defendants Activities on and near FDM*

The United States government has used FDM for military training exercises since 1971. Defendants contend that since the 1970's, FDM has represented an important and irreplaceable asset in maintaining the combat readiness of United States military units. *See generally,* Defs' Mem. in Supp. of Mot. for Summ. J., January 11, 2001, Dec. of Vice Admiral James W. Matzger ("Metzger Dec."), June 6, 2001 Dec. of Major General James E. Cartwright ("Cartwright Dec.")

In 1971, the United States and the then Government of the Trust Territory of the Pacific Islands signed a Use and Occupancy Agreement for the island of FDM, allowing the United States military to use FDM as a "aircraft and ship ordnance impact target area." Defs' Mem. in Supp. of Mot. for Summ. J. at 2–3. In 1975, the Government of the Trust Territory and the United States entered into a Covenant creating the Commonwealth of the Northern Mariana Islands (CNMI) as a commonwealth of the United States. See Pub.L. 94–241 § 1 (March 24, 1976). That Covenant included provisions related to the continued use of land by the United States for military purposes. In 1978, 1981, and finally in 1983 CNMI leased portions of its territory, including FDM, to the United States` for fifty years to be used as an "aircraft and ship ordnance impact target area." Plfs' Achitoff Dec., Ex. 5.

An Environmental Impact Statement prepared by defendants and released in June 1999 describes the "ongoing" training exercises on FDM to include the following types of activities. Defendants conduct air-to-surface gunnery exercises, in which aircraft operating from aircraft carriers deliver 500–pound bombs and air-to-

ground missiles to the surface of FDM. Aircraft fire machine guns, cannons, and missiles at the surface of FDM. According to the EIS, annual training consists of four 5–day Navy exercises, three 3–week Marine Corps exercises, and five 14–day combined force exercises. During the approximately 320 sorties flown each quarter, Air Force bombers drop 500, 750 and 2000 pound bombs, precision-guided munitions and mines on FDM. In addition, Navy ships fire 5–inch deck-mounted guns, using highly explosive, point-detonating rounds at the surface of FDM. These Navy activities may occur monthly during Pacific transits, with a ship remaining at FDM for approximately two days, and as part of joint exercises for approximately 12 days every two years. The Navy fires approximately 1,040 5–inch shells and 400 76mm shells annually. Finally, Navy SEALs use rigid hull inflatable boats to fire grenades, missiles, rifles, and machine guns at the surface of FDM approximately four times a year. *See* Achitoff Dec., Ex. 7 (June 1999 EIS).

According to defendants' own documents provided to plaintiffs via a Freedom of Information Act request, see Achitoff dec. at ¶ 9, in 1999, for example, strategic bombing exercises at FDM actually expended 538 live and inert bombs. Close air support exercises dropped 851 live and 512 inert bombs, along with 67 air-to-surface rockets and 7 air-to-surface missiles. Defendants' naval gunfire used 374 5–inch shells and small arms fire expended 6,069 rounds of 20mm ammunition. *See* Achitoff Dec., Ex. 8.

According an August 18, 1999 Record of Decision for Military Training in the Marianas, defendants propose to continue the status quo, with some modifications of tar-

---

than the MBTA. Defendants have been authorized by FWS to incidentally "take" megapodes on FDM pursuant to ESA regulations, and plaintiff does not challenge the legality of defendants' impact on these birds.

get placement. See Achitoff Dec., Ex. 9 (Record of Decision). The supplemental declarations recently filed by defendants' indicate that since the September 11, 2001 terrorist attacks on the United States and the initiation of military exercises in Afghanistan, the use of FDM has "actually increased." *See* Defs' Supp. Reply, Ex. C (December 10, 2001 Dec. of Major General James E. Cartwright, at ¶ 3). According to Major General Cartwright, "FDM's critical role in Marine aviation military readiness, and therefore national security, has dramatically increased since the September 11, 2001 terrorist attacks," and that it is "essential that FDM be available for immediate and continuous use." *Id.* at ¶ 2.

### III.  *Harm to Birds on FDM*

It is uncontested that defendants' military training activities on FDM will kill birds covered by the MBTA. "Defendants' live-fire training exercises occasionally kill migratory birds protected by the MBTA." Defs' Combined Statement of Material Facts, at ¶ 2. After a survey of FDM conducted in 1996, the FWS concluded:

> There is no question that bombing of this island will result in the death of seabirds, migratory shorebirds, and possibly even the endangered Micronesian megapode. On several occasions we observed boobies nesting very close to unexploded ordinance [sic]. While the unexploded ordinance [sic] may not provide an immediate threat to the birds, it does indicate that bombs do fall in active nesting areas. Although there may be peaks in the seabird breeding season, our observation indicate that breeding probably occurs year-round.

Achitoff Dec., Ex. 10 (1996 Report prepared by FWS wildlife biologist Micheal Lusk, attached as Appendix D–5 to defendants' Final EIS, June 1999). In 1999 the Department of Defense came to the same conclusion:

> The preferred alternative retains the use of FDM for naval gunfire and aerial bombardment. This training has potentially significant impacts that cannot be fully mitigated to levels of nonsignificance. The live-fire activities at FDM (Naval Range 7201) will cause bird mortality and habitat modification. Impact areas and target locations have been modifed to reduce impacts on known colonies and no incendiary ordnance is allowed. Despite these precautionary measures, however, it is anticipated that training may still have potentially significant impacts.

Achitoff Dec., Ex. 14 (1999 EIS at ES–25). Indeed, the FWS scientists have described defendants' activities as "likely the most destructive ... military activity (ongoing and proposed) adversely impacting federal trust activities." Achitoff dec., Ex. 6 (Memorandum from K. Evans to other FWS staff dated April 15, 1997).

### IV.  *Defendants' 1996 Permit Application*

On April 15, 1996 the Navy applied to FWS for a permit pursuant to MBTA regulations that would allow them to incidentally "take" migratory birds on FDM as a result of the military exercises there. See Achitoff Dec., Ex. 15 (Letter from Ralph Kaneshiro, Acting Director of Environmental Planning Division of the U.S. Navy to Gene Hester, Division of Law Enforcement, FWS dated April 15, 1996). That permit application described defendants' activities, and requested a permit for the "incidential" take of migratory birds, including several specific species known to nest on and inhabit FDM. *Id.* The Navy described some mitigation measures they would enact, such as "limiting training sessions to seasons in which birds are not nesting (April through January), firing at designated targets located away from the concentration of nesting birds, and hazing the birds off the island prior to live firing."

*Id.* The Navy explained that actual recovery of migratory birds is "not advisable" because the island is "considered contaminated with unexploded ordinance." *Id.* Without providing support for such an estimate, the Navy estimated that the annual take of migratory birds "will not exceed more than five individuals birds or eggs of each species listed above." *Id.* Finally, the Navy stated that "[t]he take involved is not desirable for the species involved. However, use of the area as a live fire range has the beneficial effect of reducing the negative impacts of human intrusion." [2] On the permit application form accompanying the Navy's letter, the Navy listed only one section of the regulations as justification for the application: 50 C.F.R. § 21.41. 50 C.F.R. § 21.41 authorizes permits only for depredation control, which clearly does not apply to defendants' military training activities.[3]

On August 5, 1996 FWS denied the Navy's permit request. *See* Achitoff Dec., Ex. 17 (Letter from J. Bradley Bortner, Chief, Migratory Birds and Habitat Programs, FWS, to Daniel Moriarty, National Resources Management Specialist, Pacific Division, United States Navy, dated August 5, 1996). That letter stated, "[t]here are no provisions for the Service to issue permits authorizing UNINTENDED conduct on the part of a permittee." *Id.* (emphasis in original). Furthermore, "[b]ecause such conduct is unintended, it would not be possible for a permittee to ensure compliance with required limits and conditions of a permit; particularly in light of the proposed activity described in your correspondence." *Id.* The FWS also explained their concern with the biological impact of the Navy's activities:

> Also, of concern is the biological information submitted with the application. Biologists familiar with the bird populations of the island for which the activity is requested have supplied us with the most current bird population information. Populations sizes are variable and can be limited to less than ten individuals of several of the species inhabiting the Island. In these cases, the proposed take of five birds could have significant impact on local nesting populations. Furthermore, current breeding data indicates that many of the species which populate the Island breed year round; therefore, conducting activities April through January would not ensure that birds are not nesting during that time period.

*Id.*

The 1996 permit request was not the first such request filed by the Navy. *See* Achitoff Dec., Ex. 17 (Bortner Letter of August 5, 1996) ("The Service has denied similar requests by the Navy in the Pacific Islands in the past."). It is uncontested that neither defendant has applied for or received a permit since. However, after the initiation of this lawsuit, and explicitly in response to the allegations in this lawsuit, the FWS informed both defendants in

---

**2.** The Court must note that the fact that the Navy would argue that the bombardment of this island with weapons of the number and magnitude described above is actually somehow *beneficial* to these birds because that bombardment prevents other forms of "human intrusion" is surprising.

**3.** "Depredation" refers to predatory migratory birds the regulations allow for permits to kill these predatory birds under certain circumstances. *See* 50 C.F.R. § 21.41(a) ("a depredation permit is required before any person may take, possess, or transport migratory birds for depredation control purposes"). In order to apply for a depredation permit, the applicant must identify: "(1) A description of the area where depredations are occurring; (2) The nature of the crops or other interests being injured; (3) The extent of such injury; and (4) The particular species of migratory birds committing the injury." 50 C.F.R. § 21.41(b).

this case that it believed that defendants' actions are "consistent with the responsibilities of the United States under the migratory bird treaties on which the MBTA is based." *See* Defs' Mem. in Supp. of Summ. J., Ex. C (Letter from Acting Director of FWS to Donald H. Rumsfeld, Secretary of Defense dated June 12, 2001) and D (Letter from Acting Director of FWS to Gordon R. England, Secretary of the Navy dated June 12, 2001). The FWS then stated that it has long employed "enforcement discretion" for activities that may be prosecuted pursuant to the MBTA but are not covered by the MBTA permitting regulations, that in this case it would "exercise its discretion not to take enforcement action" against the Navy and DOD. *Id.*

### V. *DOD's 1999 Environmental Impact Assessment, and Notice of Decision*

On November 28, 1995, the United States Department of Defense (DOD) published a notice of intent to develop and Environmental Impact Statement (EIS) for the military's activities in the Mariana Islands as required by Section 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C). Four years later, after numerous public meetings, and public comment periods on two draft EISs, DOD issued the Final EIS on June 11, 1999. *See* Achitoff Dec., Ex. 7, 14.

On August 18, 1999, DOD issued a Record of Decision for Military Training in the Marianas pursuant to that EIS. 64 Fed. Reg. 44904 (August 18, 1999). That Record of Decision announced DOD's decision to "continue to use suitable DOD controlled lands in the Mariana Islands to support various specific military training activities to ensure the readiness of U.S. forces tasked with fulfilling regional readiness and operational contingency missions." *Id.* That Record of Decision specifically addresses the use of FDM at issue

here, and decides to continue that use despite the identified environmental impact. *Id.*

### VI. *Harm to Military of Halting Exercises on FDM*

There is no dispute that live-fire target training is crucial to the readiness of United States armed forces. *See* Metzger Dec. at ¶ 2. According to defendants, FDM is crucial to the military's ability to conduct live-fire training in the Pacific. *Id.* FDM is the only air-to-ground target range under the control of the United States in the Western Pacific. *Id.* at 3. According to the Vice Admiral of the Navy in charge of the Seventh Fleet, James W. Metzger, "[c]onsisting of ideal hydrographic characteristics, geography, and a surrounding airspace unencumbered by heavily used commercial air corridors and sea-lanes, [FDM] is uniquely well suited for live-fire training." *Id.* The commanding officer of the 1st Marine Aircraft Wing (MAW), Major General James Cartwright agrees:

> the protected air and sea space surrounding [FDM] provides sufficient room for the many different attack profiles necessary to replicate combat conditions and the simultaneous maneuver and co-location of all supporting fires and unites require in our combat training. As such it is integral to the combat readiness of 1st MAW squadrons.

Cartwright Dec. at ¶ 2.

FDM is the "only target range in the Western Pacific, with no alternative, for supporting large scale shore based excursions, such as the Strike Fighter Advanced Readiness Program." Metzger Dec. at ¶ 5. This training is mandatory for naval aviators, and FDM allows this training to occur without leaving the Western Pacific. Vice Admiral Metzger claims that "the importance of this fact can not be overestimated" because "access to [FDM] provides

monetary and manpower cost-savings that cannot be recouped by any other means," and invaluably allows the Navy to train without "degradation in force" Id. at ¶ 5. FDM is also the only target range in the Pacific where "strike aircraft" can use air-to-ground live-ordnance with "tactically realistic and challenging targets in airspace which allows the use of high attitude profiles." *Id.*

In addition to its importance to air wing readiness, FDM is also important for Navy surface ship weapons handling and training. *Id.* at ¶ 9. According to Vice Admiral Metzger, [FDM] is the only U.S. controlled target ranger in the Western Pacific Theater where Sailors and Marines can participate in integrated naval gunfire training. It addition to being the only U.S. site, it is also the most practical and cost-efficient location." *Id.* at ¶ 9.

> The Navy and U.S. Marine Corps team require realistic training opportunities in order to master the tasks inherent in actual naval combat. Naval guns are unique weapons in that they are fired by the Navy but directed, spotted, and adjusted by Marines forward positioned ashore. Proficiency in Naval Surface Fire Support cannot be attained without live-fire exercises... The Farallon De Medinilla target range located in Guam provides these crucial training opportunities and is critical to the Navy maintaining its dominant expertise in the SEVENTH fleet area of operations.

Id. at ¶ 2–3.

Alternative sites for these types of training are located only in other countries such as Korea and Japan. *Id.; see also* Cartwright Dec. at ¶ 6. The problem with relying on other countries for training sites include problems with availability and increased logistical expenses. *Id.* Major General Cartwright explains, "Other ranges in the [Western Pacific] Theater provide portions of the capabilities found

at [FDM] and 1st MAW unites routinely deploy to these sites. However, none of these other ranges provides the target fidelity (the selection of discernible targets) or provides regular access available as does [FDM.]" Cartwright Dec. at ¶ 3.

In conclusion, Vice Admiral. Metzger states, "I do not propose that the loss of one target range will cause a complete collapse in readiness; however, it will unquestionably make it all the more difficult to maintain an acceptable level of readiness." Metzger Dec. at ¶ 8. Major General Cartwright agrees that other target ranges will "continue to be utilized to the maximum extent practicable," but FDM's "continued accessibility as an air-to-surface ordnance training range must be ensured." Cartwright Dec. at ¶ 8.

After the terrorist attacks of September 11, 2001, the importance and use of FDM for military training has increased. *See generally*, Defs.' Supp. Reply, Ex. C, December 10, 2001 Declaration of James E. Cartwright ("Supp. Cartwright Dec."), and Ex. D, December 11, 2001 Declaration of James W. Metzger ("Supp. Metzger Dec."). Vice Admiral Metzger states, "If we are prevented from training at [FDM], fleet readiness and national security will be jeopardized to a greater extent, and inadequate training will create an even higher risk to our personnel than was the case prior to September 11, 2001." Supp. Metzger Dec. at ¶ 1. Major General Cartwright agrees: "FDM's critical role in Marine aviation military readiness, and therefore national security, has dramatically increased since the September 11, 2001 terrorist attacks." Supp. Cartwright Dec. at ¶ 1.

Since September 11, 2001, the Navy has "an increased number of units required for combat operations on very short notice. With an increasing surge of short notice deployments, [FDM] becomes a necessity

for training and readiness in the war against terrorism. We rely on FDM for qualification and range practice for these short notice units." Supp. Metzger Dec. at ¶ 2. Because FDM is the only U.S. controlled target range in the Western Pacific its value is "significantly enhanced." *Id.* Specifically, "[w]ithout [FDM], and with all other ranges in the Pacific theater under foreign control, we would be at the mercy of host governments for our readiness and training. Use of foreign ranges by transiting units is inefficient, and can inhibit mission readiness, because of the time required for advance notice to and prior coordination with host governments." *Id.* Therefore, "[c]losing [FDM] will therefore mean that units transiting to the U.S. Seventh Fleet area of responsibility may not have adequate range training time before they are required to engage in combat operations in support of Operation Enduring Freedom." *Id.*

Major General Cartwright explains: "FDM usage has actually increased since the September attacks." Cartwright Dec. at ¶ 3. FDM has allowed units deployed in the Pacific to maintain combat readiness and complete live-fire training: "The capability to execute a security mission (protecting the lives of U.S. citizens and property) while at the same time conducting necessary training for future missions could not occur if the live-fire range at FDM were closed." *Id.* at ¶ 3. Furthermore, Major General Cartwright contends that increased security risks throughout the world make the extra time and distance to alternative firing ranges a problem. *Id.* Thus, "[g]iven the foreseeable or potential military action in response to possible terrorist events, it is essential that FDM be available for immediate and continuous use." *Id.* at ¶ 2.

## VIII. *Procedural History of this Case.*

Plaintiffs filed this lawsuit on December 21, 2000 alleging violations of the MBTA and APA and requesting a permanent injunction preventing any further use of FDM for military training exercises until defendants obtain a valid permit. Defendants initially moved to transfer this case to the United States District Court for the District of the Commonwealth of the Northern Mariana Islands. After briefing by the parties, this Court denied defendants' motion to transfer. The parties filed cross-motions for summary judgment. Those motions were fully briefed as of July 16, 2001.

In August of 2001, the Washington Legal Foundation (WLF) moved for permission to file an amicus brief in support of defendants, and in its proposed motion asserted a challenge to plaintiffs' standing that had not been asserted by defendants. This Court denied that motion by Order of November 21, 2001. On December 13, 2001, approximately five months after these motions were fully briefed, and one year after this case was filed, defendants filed a "Supplemental Reply" brief incorporating by reference the WLF's standing arguments. Upon plaintiff's request, the Court granted plaintiff leave to file a response to this new argument. The Court heard oral argument on these motions on March 13, 2002.

## DISCUSSION

### I. *Standard of Review*

Summary judgment should be granted only if the moving party has shown that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Aka v. Washington Hosp. Ctr.,* 116 F.3d 876, 879 (D.C.Cir.), *reh'g en banc granted,* 124 F.3d 1302 (1997). Likewise, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one

of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *See Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir.1975).

## II. *Standing*

As described above, on December 13, 2001, after the pending motions were fully briefed, defendants filed, without requesting leave from this Court to do so, a supplemental reply brief challenging for the first time plaintiffs' standing to bring this suit. Rather than construct their own arguments, defendants incorporated by reference a proposed amicus brief by WLF. WLF's request to file that brief had been denied by this Court for the reasons set forth in an Order issued on November 21, 2001. This Court would have been well within its discretion to deny defendants' leave to file this surreply for violating the Local Rules of Civil Procedure. However, this Court will consider this standing argument *only* because it goes to the subject matter jurisdiction of this Court. *See* Fed. R.Civ.P. 12(h) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

██ Contrary to defendants' arguments, plaintiff has satisfied the requirements for standing. To satisfy the case or controversy requirement of Article III of the Constitution, a plaintiff must show (1) that it has suffered a concrete and particularized injury that is actual or imminent not merely conjectural or hypothetical, (2) that the injury is fairly traceable to the challenged action of the defendant, and (3) that injury is fairly redressable by a decision of this Court. *See, e.g., Friends of the Earth v. Laidlaw Environmental Services*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In addition, an organization has standing to sue on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of the individuals members in the lawsuit. *Laidlaw*, 528 U.S. at 181, 120 S.Ct. 693.

The declarations submitted by plaintiff of its Assistant Executive Director, Bruce Eilerts, and one of its members, Ralph Frew, demonstrate that CBD has standing to sue on behalf of its members. *See* Plfs' Mem. in Supp. of Mot. for Summ. J., Declaration of Bruce Eilerts ("Eilerts Dec."), and Declaration of Ralph Frew ("Frew Dec."). The interests at stake in this litigation, the protection of migratory birds pursuant to the MBTA, are germane to the purpose of plaintiff. *See* Eilerts Dec. Furthermore, neither CBD's claim nor the requested relief require the participation of any individual members of CBD.

██ Defendants argue that CBD has failed to demonstrate that any of its members have suffered a concrete injury as a result of defendants' actions. It is well settled that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing." *Laidlaw*, 528 U.S. at 183, 120 S.Ct. 693. The declaration of Ralph Frew demonstrates that Mr. Frew's ability to observe several types of migratory birds is being harmed by defendants' actions. Mr. Frew explained that he lives most of the year on Guam, and travels on "an irregular but frequent basis" to Saipan, Tinain, and Rota in the Commonwealth of the Northern Mariana Islands, primarily to study birds. Frew Dec. at ¶ 2. Mr. Frew, the former President of the Northern Marianas Islands Audubon Society, seeks out and observes

the bird species that nest on FDM. *Id.* at ¶ 3. In particular, Mr. Frew has recently viewed white-tailed and red-tailed tropic birds, brown and red-footed boobies, frigate birds, brown noddies, and fairy terns, all of which are migratory birds found on FDM and that can "fly the relatively short distances between the islands of the Marianas chain." *Id.* Mr. Frew is not a newcomer to observing these birds, and has been participating in the annual Christmas bird count for years, and intends to continue doing so. *Id.* at ¶ 3.

Defendants argue that Mr. Frew's alleged injury is too speculative because he does not visit the island of FDM himself but regularly travels only to nearby islands to observe and study the types of birds that nest on FDM. However, Mr. Frew's ability to observe these birds is undeniably harmed by defendants' activities on FDM. It is true that Mr. Frew is prevented from visiting FDM itself because that island is off-limits to the public as a result of defendants' activities there. Furthermore, visiting the island to view or count birds would be extremely dangerous because FDM is riddled with unexploded ordnance. However, defendants' killing of the migratory birds that are on FDM clearly impacts the ability of Mr. Frew and others like him to observe these migratory birds on the surrounding islands. Defendants do not dispute the fact that their live-fire training kills birds. *See* Defs' Combined Statement of Material Facts, at ¶ 2. While it is difficult to calculate the precise number of birds that are being harmed by defendants' activities, it is clear from the record that defendants are killing a significant number of these birds on an ongoing basis. *See* Plfs' Mem. in Supp. of Mot. for Summ. J., Declaration of Paul Atchitoff ("Atchitoff Dec."), Ex. 10, 12, 14, 15. The military's own Environment Impact Statement concluded that "This training has potentially significant impacts that cannot be fully mitigated to levels of nonsignificance. The live-fire activities at FDM (Navy Range 7201) will cause bird mortality and habitat modification." Achitoff dec., Ex. 14. The FWS' denied a permit to defendants for precisely because of the potential "significant impact" of these killings on the local bird population. Achitoff Dec., Ex. 17. Thus, Defendants' attempts to characterize the impact of their activities on bird life as "de minimus" are completely unsupported.

It is also undisputed that the birds being killed and harmed by defendants' activities are migratory. By definition they do not stay on FDM, but travel to the near by islands that Mr. Frew is permitted to visit. Because these birds fly from island to island, if birds are killed on FDM, the number of birds that Mr. Frew will be able to view at any given time on the nearby islands will be diminished. This is sufficient injury to support standing. Defendants' suggestion that standing requires proof that "*every* migratory bird of *every* species on FDM visits *every* other island in the 500 mile chain of the CNMI, including the four islands Mr. Frew visited," is totally unsupported by standing precedent. *See* Defs' Supp. Reply, Ex. A (WLF Amicus Brief) at 16.[4] The list of cases that support plaintiff's standing under these circumstances is long. *See, e.g., Laidlaw,* 528 U.S. at 181, 120 S.Ct. 693 (injury suffi-

4. Furthermore, defense counsel attempted to argue that the hearing on March 13, 2002 that plaintiff has not been harmed because the military activities on FDM have been killing birds for all the years that Mr. Frew has been observing birds in the area. Although the Court does not accept this argument, even if it were true that a constant rate of killing birds by defendant meant that Mr. Frew's ability to view birds has not actually been diminished, this argument is undermined by the fact that defendants' own evidence shows that the use of FDM has increased considerably since September 11, 2001.

cient where plaintiffs lived 20 miles of affected area, where some plaintiffs used areas within 40 miles of the affected area, and where some plaintiffs were deterred from using area); *Japan Whaling Ass'n v. American Cetacean Society*, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (injury sufficient when the "whale watching and studying of their members will be adversely affected by continued whale harvesting" by Japan); *Hill v. Norton*, 275 F.3d 98 (D.C.Cir.2001) (reversing lower court but agreeing that plaintiff had standing to sue under MBTA because a diminished presence of mute swans near her property would reduce her aesthetic enjoyment). Plaintiff in this case is not required to wait until Mr. Frew and others are completely unable to view any members of the species of birds that defendant is illegally killing before being granted access to this Court.

Finally, the Court must note that defendants have adopted, along with the rest of WLF's brief, the argument that plaintiffs have suffered insufficient injury because the more birds that the defendants kill, the more enjoyment Mr. Frew will get from seeing the ones that remain: "bird watchers get more enjoyment spotting a rare bird than they do spotting a common one." *See* Defs' Supp. Reply, Ex. A (WLF Amicus Brief) at 16–17. Suffice it to say, there is absolutely no support in the law for the view that environmentalists should get enjoyment out of the destruction of natural resources because that destruction makes the remaining resources more scarce and therefore valuable. The Court hopes that the federal government will refrain from making or adopting such frivolous arguments in the future.

Because plaintiff has demonstrated an actual and particularized injury to its members' ability to view these species of migratory birds, that is directly caused by defendants' unauthorized killing of these birds, and is redressable by an injunction halting defendants' activities, the requirements of Article III have been satisfied here.

III. *Defendants Have Violated the MBTA and the APA's Prohibition of Unlawful Agency Action*

A. *Defendants Actions Violate the MBTA*

▮▮▮ The MBTA was enacted in 1918 to implement a convention between the United States and Great Britain (on behalf of Canada) for the protection of migratory birds. It has since been amended to cover conventions with Mexico, Japan, and the former Soviet Union. 16 U.S.C. §§ 703, 712. The MBTA prohibits, among other things, any killing of designated migratory birds. The language of the MBTA is unequivocal:

> Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill ... any migratory bird ... included in the terms of the [conventions between the United States and Great Britain, Mexico, Japan, and Russia.].

16 U.S.C. § 703. This prohibition applies with equal force to federal agencies. *Humane Society v. Glickman*, 217 F.3d 882 (D.C.Cir.2000).[5]

**5.** Defendants clearly disagree with the D.C. Circuit's holding in *Glickman*. *See* Defs' Mem. in Supp. of Mot. for Summ. J. at 14 n. 5 and Ex. C, D. As much as defendants may prefer otherwise, the pre-*Glickman* holdings of other Circuits are both unpersuasive and not controlling here. *See Sierra Club v. Martin*, 110 F.3d 1551 (11th Cir.1997), and *Newton County Wildlife Association v. U.S. Forest Service*, 113 F.3d 110 (8th Cir.1997). The law of this Circuit is clear that the MBTA applies to federal agencies.

Defendants do not dispute that several species of birds found on FDM are protected by the MBTA. Nor do defendants deny that some of these birds have been killed and will be killed as a result of defendants activity. *See* Defs' Statement of Facts at 2 ("Defendants' live-fire training exercises are likely to occasionally would or kill migratory birds protected by the MBTA").

Thus, defendants activities are unlawful unless they are in some way authorized by the regulations promulgated pursuant to the authority granted in the MBTA. Defendants can find no such authorization in the regulations. The MBTA authorizes the Secretary of the Interior to promulgate regulations permitting the taking of migratory birds as long as the regulations are consistent with the Convention. 16 U.S.C. § 704; 712(2). The regulations prohibit the taking, possessing, importation, exportation, transportation, selling, or purchasing of any migratory birds except as allowed by a valid permit. 50 C.F.R. § 21.11. "Take" is further defined in the regulations to include "pursue, hunt, shoot, wound, kill, capture, or collect," or attempt to do so. 50 C.F.R. § 10.12.

As discussed above, defendants applied to FWS for a permit allowing them to take birds in connection with their activities on FDM and that application was denied on August 5, 1996. Despite that permit denial, defendants have continued to kill migratory birds. Because they continue to kill these birds without complying with the statutory and regulatory provisions for a permit, defendants are violating the MBTA.

Defendants emphasize repeatedly that their killing of these birds is "unintentional." [6] This description is misleading. Defendants' own documents amply establish that defendants are knowingly engaged in activities that have the direct consequence of killing and harming migratory birds.[7] *See, e.g.,* Defs' Combined Statement of Material Facts, at ¶ 2 ("Defendants' live-fire training exercises occasionally kill migratory birds protected by the MBTA."); Achitoff Dec, Ex. 15 (1996 Navy permit application to FWS). Such knowing behavior is legally sufficient to establish intent. *See e.g., United States v. Salamanca,* 990 F.2d 629, 636 n. 2 (D.C.Cir.1993) ("it may be inferred that a person intends the natural and probable consequences of his acts") (*quoting Allen v. United States,* 420 F.2d 223, 225 n. 1 (D.C.Cir.1969)).

However, even if this Court accepts defendants' argument that these killings are "unintentional," the MBTA prohibits both intentional and unintentional killing. Courts have consistently refused to read a scienter requirement into the MBTA. *See, e.g., United States v. Corrow,* 119 F.3d 796, 805 (1997) (holding that the MBTA is a "strict liability" statute); *United States v. Boynton,* 63 F.3d 337, 343 (4th Cir.1995); *United States v. Smith,* 29 F.3d 270, 273 (7th Cir.1994); *United States v. Engler,* 806 F.2d 425, 431 (3d Cir.1986); *United States v. Manning,* 787 F.2d 431, 435 n. 4

---

6. The Court can only surmise that defendants mean by this that they are not actually purposefully firing their guns or aiming their bombs directly at the birds.

7. Defendants' suggestion in their reply brief that they are not "knowingly" killing migratory birds is baffling in light of the entire record that has been submitted in this case, including for example, the Navy's 1996 permit application to FWS that admits that they know they are killing these birds, as well as defendants' statement of undisputed facts in this case, which also admits they know that they are killing these birds. *See* Defs' Reply at 6 n. 2 ("Plaintiff attempts to supply with rhetoric what it lacks in law, now suggesting that Defendants are actually 'knowingly' and 'intentionally' killing migratory birds. Pltf's opp. memo, p. 6.").

(8th Cir.1986); *United States v. Catlett,* 747 F.2d 1102, 1105 (6th Cir.1984); *United States v. Wood,* 437 F.2d 91 (9th Cir.1971). Defendants admit that "the FWS, in conjunction with DOJ, has *prosecuted* unintentional takes under the MBTA, and federal courts have in some circumstances affirmed the MBTA's applicability to unintended take in the pursuit of other lawful activities." Defs' Mem. in Supp. of Mot. for Summ. J., at 15 (emphasis in original). As is clear from the list of cases cited above, defendants description of the precedent is something of an understatement courts consistently hold that the MBTA applies to both intentional and unintentional behavior. Indeed, defendants admit that the FWS has prosecuted individuals for unintentional violations of the MBTA. As will be addressed below, whether or not FWS has chosen to exercise its prosecutorial discretion to expend resources on prosecuting unintentional takes in no way alters the legal question of whether such behavior violates the MBTA.

B. *Defendants Actions Violate the APA*

■ The MBTA provides no private cause of action against the United States government to enforce its provisions. However, plaintiff argues that because defendants' actions violate the MBTA, they should be held liable for violating the APA's prohibition on agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Once again, the law of this Circuit is clear: a plaintiff may sue a federal agency under the APA for violations of the MBTA. *See Glickman,* 217 F.3d 882 (holding that federal agency action in violation of MBTA violates the "otherwise not in accordance with law" provision of the APA); *see also Hill v. Norton,* 275 F.3d 98 (D.C.Cir.2001) (holding that agency regulations that violate MBTA are reviewable via the APA).

Despite the holding of *Glickman,* defendants argue that plaintiff's APA claim must fail on two grounds: first, defendants argue that plaintiffs have failed to challenge a final agency action, as required by 5 U.S.C. § 704; and second, defendants argues that prosecution of the unintentional killing of migratory birds is a discretionary function delegated to the FWS of which judicial review is improper under APA 5 U.S.C. § 701(a)(2). Neither of these defenses has merit.

1. *Final Agency Action*

■ The APA authorizes review only of "final agency action[s]." 5 U.S.C. § 704. This requirement is jurisdictional that is, for a court to have jurisdiction over a case brought pursuant to the APA, the complaint must challenge a final agency action. *Independent Petroleum Ass'n of America v. Babbitt,* 235 F.3d 588, 594 (D.C.Cir. 2001); *DRG Funding Corp. v. Secretary of Housing & Urban Development,* 76 F.3d 1212, 1214 (D.C.Cir.1996) ("If the agency action is not final, the court therefore cannot reach the merits of the dispute.").

■ The APA defines agency action to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). In determining whether such action is final, courts should consider "whether the agency's position is 'definitive' and whether it has a 'direct and immediate ... effect on the day-to-day business' of the parties." *Ciba–Geigy Corp. v. United States Envtl. Protection Agency,* 801 F.2d 430, 436 (D.C.Cir.1986) (*quoting Federal Trade Comm'n v. Standard Oil Co. of Cal.,* 449 U.S. 232, 239, 101 S.Ct. 488, 66 L.Ed.2d 416, (1980) (internal quotes omitted)). As the Supreme Court explained in *Bennett v. Spear,* an agency action is final if it "mark[s] the consummation of the agency's

decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) ((citations and internal quotes omitted)).

Defendants argue that rather than identifying a particular agency action, plaintiffs challenge the "general practices of the United States in conducting military training exercises from time to time on FDM." Defs' Mem. In Supp. of Mot. for Summ. J. at 19. This is inaccurate. Plaintiffs are challenging the August 18, 1999 Record of Decision that announces the specific decision to continue to use FDM for live fire military exercises that was made in light of the EIS published by the U.S. Pacific Command in June of 1999. *See* 64 Fed.Reg. 44904 (August 18, 1999). This Court has previously held that similar Records of Decision issued pursuant to NEPA are final agency actions for purpose of the APA. *See Anacostia Watershed Soc. v. Babbitt,* 871 F.Supp. 475, 480 (D.D.C. 1994) ("The Record of Decision and official Transfer of Jurisdiction plan demonstrate that the Park Service's decision to transfer jurisdiction to the District of Columbia was a final agency action.").

At oral argument on March 13, 2001, Defendants argued that the August 18, 1999 Record of Decision was issued simply to comply with the requirements of NEPA and made no decision with respect to the continuation of the legally authorized military exercises on FDM. This argument by counsel does not comport with the language of the Record of Decision. The Record of Decision states "The Department of Defense (DoD) through Commander, U.S. Naval Forces Marianas ... pursuant to [NEPA and its implementing regulations] hereby *announces its decision to continue to use suitable DoD controlled lands in the Mariana Islands to* *support various specific military training activities . . . " Id.* (emphasis added). This Record of Decision "mark[s] the consummation of the agency's decisionmaking process," with respect to whether to continue those activities in light of the environmental consequences identified in the EIS. *Bennett,* 520 U.S. at 178, 117 S.Ct. 1154. This decision came from the highest levels within the DOD and was in no way tentative or preliminary. This Record of Decision marked the culmination of *over four years* of investigating the environmental impact of these military activities pursuant to the requirements of NEPA.

Furthermore, after analyzing several different options, this Record of Decision committed the United States' armed forces to a plan for specific uses of the Mariana Islands, an act "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett,* 520 U.S. at 178, 117 S.Ct. 1154. DOD recognized the environmental consequences of continuing military exercises on FDM and made an official decision to continue those actions despite those consequences. As a direct consequence of the DOD's decision to continue using FDM as a live-fire target range, protected migratory birds have been and are being killed in violation of the MBTA.

Because plaintiff alleges that a specific decision, the August 18, 1999 Record of Decision, to conduct a specific activity, live-fire military training on FDM, violates a specific statute, the MBTA, is unlawful agency action, this case differs from those programmatic challenges that courts have held fall outside the scope of a "final agency action" under the APA. *See, e.g., Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (rejecting a general challenge to the Bureau of Land Management's land withdrawal program involving a number of dif-

ferent types of administrative actions with respect to many different tracts of land). In contrast to the D.C. Circuit's opinion in *Independent Petroleum Assoc. of America v. Babbitt,* 235 F.3d 588, 594 (D.C.Cir. 2001), that "[plaintiffs'] complaint not only does not challenge final agency action, it is not at all clear what agency action [plaintiffs] purport[ ] to challenge," it is very clear what agency decision plaintiff here contests, the August 18, 1999 Record of Decision, and what consequences with which plaintiffs are concerned, the military live-fire training exercises that that Record of Decision authorized.

## 2. *Prosecutorial Discretion*

■ Defendants argue that plaintiffs can not sue them under the APA because the prosecution of unintentional killings of migratory birds is a matter properly left to the prosecutorial discretion of the FWS. This argument is simply defendants' disagreement with the *Glickman* holding in sheep's clothing. As discussed above, federal agencies can be subject to suits for violations of the MBTA pursuant to the APA's prohibition on unlawful action regardless of whether those violations are intentional or unintentional. Whether the agency intentionally kills the birds or not, it is violating the law. And because the APA provides a cause of action to challenge unlawful agency actions, whether or not one federal agency has violated a federal law is not an issue left to the prosecutorial discretion of another federal agency.

Defendants argue that because FWS has in the past refrained from prosecuting unintentional killings of migratory birds, this Court should defer to the FWS's prosecutorial discretion. Defendants attempt to invoke the provision of the APA that states that judicial review of agency action

is available "except to the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Even if it were true that the FWS has consistently exercised its discretion to *not* prosecute or permit unintentional violations of the MBTA,[8] plaintiff is not challenging any decision by the FWS. If plaintiffs sued the FWS and claimed that they were required to prosecute the Navy and DOD officials who are killing those birds, then perhaps defendants' argument would apply. Plaintiffs have not sued the prosecutors, they have sued the violators. Defendants' argument simply does not apply. It is fundamental that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). Congress and the President together passed the MBTA and made defendants' activity a crime, and together have given the citizens of this country the right to sue their federal government civilly when it violates the law. That is the beginning and end of this Court's inquiry.

Finally, if FWS exercises its discretion and generally does not prosecute "unintentional" violations of the MBTA, when such activity clearly violates the law, this is even more reason for plaintiff to proceed with its action here. FWS is on record in this case stating that they will not prosecute defendants' activities on FDM. *See* Defs' Mem. in Supp. of Mot. for Summ. J., Ex. C, D. Without plaintiff acting as a "private attorney general," no one would prevent these violations from occurring.

## CONCLUSION

For the foregoing reasons, defendants' decision to continue the military training exercises on FDM, as reflected in defen-

---

**8.** Defendants' recent submissions undermine their early contentions regarding FWS' consistency with respect to issuing permits for

unintentional takes. *See* Defs' Supp. Reply (*citing Fund for Animals v. Mainella,* Civ. No. 01–2288 (D.D.C.2001)).

dants' 1999 Record of Decision, violates the MBTA and the APA. It is hereby

**ORDERED** that plaintiff's motion for summary judgment is **GRANTED** with respect to liability; it is

**FURTHER ORDERED** that defendants' motion for summary judgment is **DENIED** with respect to liability; it is

**FURTHER ORDERED** that the parties are to brief the following questions with respect to remedy that were read by this Court into the record at the March 13, 2002 hearing:

1. Defendants' activities are clearly violating the MBTA and the APA. Why should this Court not enforce the law as it is written and issue an injunction halting these activities.

2. The *Tennessee Valley Authority* and *Weinberger* cases are from 1978 and 1982—are there any more recent cases discussing the conflict between environmental laws and military interests with respect to issuing an injunction?

3. In the context of military interests or any other interests, are there any cases that discuss whether injunctions must issue for violations of the MBTA?

4. Are there cases that discuss whether injunctions must issue for violations of the "otherwise in not in accordance with law" provision of the APA?

5. *Weinberger* stands for the proposition that in deciding the scope of a federal court's equitable jurisdiction with respect to violations of federal statutes, the Court can not conclude that an injunction *must* issue solely based on the fact of the statutory violation itself. Rather, the Court must inquire into the *purpose* and *language* of the statute in order to assess whether Congress has clearly

limited the court's discretion. Thus, this Court must look to the statutory language and purpose at issue here. Should the Court look to the MBTA or the APA to make that determination?

6. Has § 706 of the APA removed this Court's discretion to refuse to issue an injunction setting aside agency action? Why or why not.

7. Are defendants' activities eligible for a permit from FWS for these activities under any interpretation of the current regulations? Which regulations and how.

8. If none of the current regulations would allow a permit in this situation, does the administration have statutory authority to amend those regulations to cover this situation- or is the statutory grant of authority limited so as to exclude military needs?

9. Has Congress ever considered or is Congress currently considering a military/national security exception to the MBTA? Has such an amendment ever been proposed, voted on, or passed?

10. Are there any of the challenged military exercises that wouldn't harm or kill the birds? Is there any way for defendants to mitigate the damage short of halting all activity?

11. If this Court enjoins defendants' training exercises on FDM, what will happen the next day? Where else would the military go to train?

12. What efforts are currently being made by the Administration with respect to Congressional action related to this case or the application of the MBTA to FDM.

13. Why did the Navy cite 50 C.F.R. § 21.41 on its 1996 permit application form?

It is **FURTHER ORDERED** that with respect to any differences between the transcript of the March 13, 2002 hearing and this Order, the questions as written in this Order control; it is

**FURTHER ORDERED** that plaintiff's brief addressing the above issues shall be filed no later than **March 27, 2002;** it is

**FURTHER ORDERED** that defendants' brief responding to plaintiff and addressing the above issues.shall be filed no later than **April 10, 2002;** it is

**FURTHER ORDERED** that plaintiff's reply shall be filed no later than **April 17, 2002;** it is

**FURTHER ORDERED** that in addition to filing their briefs with the Clerk of the Court the parties shall e-mail an electronic courtesy copy of their briefs to the following e-mail address: sullivan chambers@dcd.uscourts.gov.; it is

**FURTHER ORDERED** that a hearing will be held to discuss the proper remedy in this case on **April 30, 2002 at 1 p.m.** in **Courtroom Nine.**

**IT IS SO ORDERED.**