The FUND FOR ANIMALS, et al., Plaintiffs,

v.

Gale NORTON, Secretary, Department of the Interior, et al., Defendants.

Kathryn Burton, et al., Plaintiffs,

v.

Gale Norton, et al., Defendants.

Nos. CIV.A.ECF 03–1710 EG, CIV.A.EDF 03–1102 EG.

United States District Court, District of Columbia.

Sept. 9, 2003.

4. It is noteworthy that District did not respond to this argument at all in its Opposition.

Jonathan R. Lovvorn, Esquire, Amy Atwood, Esquire, Howard M. Crystal, Esquire, Meyer & Glitzenstein, Washington.

Valerie J. Stanley, Esquire, Rockville, MD.

Robert Lee Gulley, Esquire, U.S. Department of Justice, Washington.

Paul Cucuzzella, Esquire, Office of the Attorney General for the State of Maryland, Baltimore, MD.

### MEMORANDUM OPINION

SULLIVAN, District Judge.

Pending before this Court is plaintiffs' motion for a preliminary injunction. Plaintiffs ask this Court to enjoin the State of Maryland from killing 525 mute swans over the remainder of this calendar year pursuant to a depredation permit issued by the U.S. Fish and Wildlife Service ("FWS") on August 11, 2003.

### I. Parties

Plaintiff Fund for Animals is a national non-profit organization headquartered in New York City, NY, with a campaign office in Silver Spring, Maryland, and 200,-000 members nationwide. The organization is "committed to preserving animal and plant species in their natural habitats, and to preventing the abuse and exploitation of wild and domestic animals." Compl. ¶ 4. It brings this action on its own behalf and on behalf of its members who regularly observe, photograph, and study mute swans and other migratory birds, and who would therefore suffer aesthetic harm as a result of the killing of

mute swans in Maryland pursuant to the FWS permit. *Id.* ¶ 5.

Plaintiff Patrick Hornberger lives on the Chesapeake Bay, in Trappe, Maryland, in an area in which a dozen or more mute swans can be found throughout the year. *Id.* ¶ 7. He enjoys viewing, hearing, feeding, and photographing the mute swans on and near his property, and has developed relationships with individual mating pairs. *Id.* He has also traveled to several other areas within the state of Maryland to interact with mute swans, and plans to do so again in the future. *Id.*

Plaintiff Wanda Morton lives in Easton, Maryland, and owns a farm along the Wye River, a tributary of Chesapeake Bay. *Id.* ¶ 10. She too enjoys viewing, hearing, feeding, and photographing mute swans on and near her property, and has become familiar with individual mating pairs, going so far as to name several of them.[1] *Id.*

Defendant Gale Norton is the Secretary of the Department of the Interior, and is sued in her official capacity, based on her duty to ensure that the agencies within the Department comply with the requirements of the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703–712 (2003), National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332 *et seq.* (2003), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.* (2003). *Id.* ¶ 18. Defendant Steven Williams is the Director of the Fish and Wildlife Service, and is sued in his official capacity as the person ultimately responsible for the issuance of the permit challenged here. *Id.* ¶ 19.

The Maryland Department of Natural Resources ("MDNR"), the holder of the challenged permit and the state agency responsible for its implementation, was granted permission to intervene as a party defendant on August 15, 2003, with the consent of the parties. *Fund for Animals v. Norton,* Civil Action No. 03–1710, Order of August 15, 2003.

## II. Background

The mute swan, *Cygnus olor,* is a non-native species descended from birds imported from Europe to North America for ornamental purposes. *See Hill v. Norton,* 275 F.3d 98, 99 (D.C.Cir.2001). There are approximately 14,000 mute swans in the "Atlantic Flyway," which is made up of 17 states along the Eastern Seaboard of the United States, ranging from Maine to Florida. *Final Environmental Assessment for the Management of Mute Swans in the Atlantic Flyway* (July 31, 2003) ("Final EA") at 26–27.

Prior to the D.C. Circuit's 2001 ruling in *Hill v. Norton,* in which the Court of Appeals deemed mute swans to be protected by the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703–712 (2003), primary responsibility for the management of mute swan populations fell to the states. *See Hill v. Norton,* 275 F.3d at 100. The federal Department of the Interior also engaged in management of mute swans on federal properties, including the Blackwater National Wildlife Refuge located in the State of Maryland, on an *ad hoc* basis. *Id.* at 100.

Following the Circuit's ruling in *Hill v. Norton,* the FWS began issuing permits authorizing the "take"[2] of mute swans to

---

1. Plaintiffs Kay Garcia and Emily Cox live in Connecticut and Massachusetts, respectively, and make similar allegations. *Id.* ¶¶ 12, 16. However, because they do not allege that they live in or travel to the state of Maryland, their claims are not relevant to the motion presently before the Court.

2. Under the regulations promulgated pursuant to the Migratory Bird Treaty Act, to "take" a bird covered by the Act is to "pur-

states requesting them for purposes of managing the mute swan population. Pls.' Mem. in Supp. Mot. Prelim. Inj. ("Pls.' Mot.") at 6–7; Fed. Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. ("Def.'s Opp'n") at 5. Prior to July 2003, FWS did so without performing any prior assessment of their environmental impacts, based on its finding that issuance of the permits fell within a "categorical exclusion" to the requirements of the National Environmental Policy Act ("NEPA").[3] Def.'s Opp'n at 5–6. During calendar year 2002, FWS issued 66 permits authorizing the lethal take of 1,758 mute swans, and 66 permits authorizing lethal take of 3,605 mute swans in calendar year 2003. *Id.* at 5.

On March 13, 2003, the state of Maryland applied to FWS for a permit authorizing it to "remove up to 1,500 adult and subadult mute swans" as part of "a comprehensive mute swan management plan that will be implemented in 2003." *See* Maryland Dep't of Natural Res. Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. ("MDNR Opp'n") at 28, Ex. 5. Approximately a month later, Maryland published *Mute Swans in Maryland: A Statewide Management Plan* (April 14, 2003) ("MD Plan"). On April 17, 2003, the FWS granted Maryland's request for a permit authorizing the killing up to 1,500 mute swans. Pls.' Mot. at 7, Ex. 9; Def.'s Opp'n at 5.

Shortly thereafter, plaintiff Fund for Animals commenced an action challenging the issuance of the Maryland permit. *Fund for Animals v. Norton*, Civil Action No. 03–1049 (D.D.C.2003). The case was subsequently voluntarily dismissed in exchange for Maryland's voluntary temporary surrender of its permit pending

preparation of a NEPA Environmental Assessment ("EA") by the FWS which would review the issuance of permits authorizing take of mute swans to a number of states along the Eastern Seaboard. Pls.' Mot. at 7; Def.'s Opp'n at 6. During the EA process, permits issued to states other than Maryland, including Delaware, New Hampshire, New York, Michigan, Ohio, Pennsylvania, Rhode Island, Vermont, and Wisconsin remained in effect, and presumably were acted upon. Pls.' Mot. at 7. A separate action challenging several of these permits was initiated in May of 2003, and has been consolidated with this case. *Burton v. Norton,* Civil Action No. 03–1102, and *Fund for Animals v. Norton,* Civil Action No. 03–1710, Order of August 15, 2003. Plaintiffs commenced this action on August 11, 2003, challenging all permits issued pursuant to the EA prepared in response to their previous litigation.

On July 2, 2003, FWS published a notice in the Federal Register indicating that a *Draft Environmental Assessment on the Management of Mute Swans in the Atlantic Flyway* ("Draft EA") was available for review by written request to the agency or on the agency's World Wide Web site, and setting a July 16, 2003 deadline for submission of written comments. 68 Fed.Reg. 39,593 (July 2, 2003). The Draft EA concluded that mute swans are causing environmental damage by consuming up to 8 lbs per day of Submerged Aquatic Vegetation ("SAV"), underwater plant communities critical to the functioning of Chesapeake Bay and other watersheds, and through foraging and nesting habits which

---

sue, hunt, shoot, wound, kill, trap, capture, or collect," or to attempt any such act. 50 C.F.R. § 10.12 (2003).

**3.** Agencies may determine that certain actions qualify for a "categorical exclusion" from the

requirements of NEPA where they find that the actions "do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4; 40 C.F.R. § 1507.3.

further destroy significant quantities of SAV. Draft EA at 3. The Draft EA considered four alternative methods of achieving the FWS' "primary goal" of "minimiz[ing] environmental damage ... by mute swans" in the Atlantic Flyway, and proposed that the agency issue permits authorizing states to kill mute swans as part of integrated management plans so as to reduce the overall Flyway population from its current level of 14,300 birds to its 1986 level of 4,675 birds. *Id.* at viii, 1, 14.

On August 7, 2003, the agency published a Final EA dated July 31, 2003, and issued a "Finding of No Significant Impact" ("FONSI") and a Record of Decision ("ROD") memorializing its conclusion that its "preferred alternative," the issuance of depredation permits as part of an integrated population management plan contemplating "lethal take" of mute swans, combined with egg addling,[4] pinioning,[5] sterilization, and live-trapping and relocation, would have no "significant impact on the human environment," and therefore preparation of an Environmental Impact Statement ("EIS") was unnecessary. 68 Fed.Reg. 47,084–85. On August 11, 2003, FWS granted Maryland's renewed application for a depredation permit, authorizing the State to kill up to 525 mute swans between August 27 and December 31, 2003. Administrative Record ("AR") at 1801–07.

Plaintiffs in *Fund for Animals v. Norton,* Civil Action No. 03–1710, commenced their action the following day, and, on August 14, 2003, moved for injunctive relief. Plaintiffs ask this Court to enjoin the State of Maryland from killing any mute swans pursuant to the August 11, 2003 depredation permit, or any other, until further Order of the Court.

### III. Statutory Framework

#### A. *MBTA*

Plaintiffs assert a claim pursuant to the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703–712 (2003) and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* (2003). The MBTA was enacted in 1918 to implement a convention between the United States and Great Britain (on behalf of Canada) for the protection of migratory birds. *Center for Biological Diversity v. Pirie,* 191 F.Supp.2d 161, 173 (D.D.C.2002), *vacated as moot sub nom. Center for Biological Diversity v. England,* Nos. 02–5163 and 02–5180, 2003 WL 179848 (D.C.Cir. Jan.23, 2003). It has since been amended to cover conventions with Mexico, Japan, and the former Soviet Union. 16 U.S.C. §§ 703, 712. The language of the MBTA is unequivocal, and prohibits, among other things, any killing of designated migratory birds

> [u]nless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill ... any

---

**4.** Egg addling is described in the Final EA as enjoying widespread support as a "suitable and humane technique for suppressing production of young." Final EA at 17. It involves either (1) vigorously shaking mute swan eggs or puncturing a small hole in the shell and stirring the contents so as to physically destroy the developing embryo or (2) spraying food-grade oil on the surface of the egg so as to prevent the exchange of oxygen through the shell membrane and suffocate the embryo. *Id.* Because the eggs are not visibly destroyed, the female mute swan continues to tend to them for the duration of the normal incubation period, thereby suppressing the reproductive success of a mating pair for a year. *Id.*

**5.** Pinioning involves "amputation of the outer wing," and is "a commonly used method of flight restraint in waterfowl." 68 Fed.Reg. 47,084.

migratory bird ... included in the terms of the [conventions between the United States and Great Britain, Mexico, Japan, and Russia.].

16 U.S.C. § 703.

■ Although "the MBTA provides no private cause of action against the United States government to enforce its provisions, ... the law of this Circuit is clear: a plaintiff may sue a federal agency under the APA for violations of the MBTA." *Center for Biological Diversity v. Pirie*, 191 F.Supp.2d at 175; *see also Hill v. Norton*, 275 F.3d at 103; *Humane Society of the United States v. Glickman*, 217 F.3d 882 (D.C.Cir.2000) (holding that federal agency action in violation of MBTA violates the "otherwise not in accordance with law" provision of the APA). The APA requires courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706 (2003).

Permits such as that challenged here are governed by regulations issued pursuant to the MBTA:

> The MBTA authorizes the Secretary of the Interior to promulgate regulations permitting the taking of migratory birds as long as the regulations are consistent with the Convention. 16 U.S.C. § 704; 712(2). The regulations prohibit the taking, possessing, importation, exportation, transportation, selling, or purchasing of any migratory birds except as allowed by a valid permit. 50 C.F.R. § 21.11.

*Center for Biological Diversity v. Pirie*, 191 F.Supp.2d at 174.

Pursuant to MBTA regulations, FWS issued a "depredation" permit authorizing Maryland to "take" mute swans as part of its overall mute swan management plan.[6] Under the applicable regulation, in order to obtain a depredation permit, the applicant must provide:

> (1) A description of the area where depredations are occurring; (2) The nature of the crops or other interests being injured; (3) The extent of such injury; and (4) The particular species of migratory birds committing the injury.

50 C.F.R. § 21.41(b).

**B. NEPA**

Plaintiffs also assert a claim under the National Environmental Protection Act ("NEPA"), 42 U.S.C. § 4332 *et seq.*, which requires federal agencies to prepare an Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Such an EIS must address (1) the "environmental impact of the proposed action;" (2) any "adverse environmental effects which cannot be avoided;" (3) "alternatives to the proposed action;" (4) the balance between "local short-term use of [the human] environment and the maintenance of long-term productivity;" and (5) "any irreversible and irretrievable commitment of resources." 42 U.S.C. § 4332(C)(i)-(v).

Under the governing regulations, promulgated by the Council on Environmental Quality ("CEQ"), generally an agency first prepares an Environmental Assessment ("EA") to determine whether a proposed action will "significantly affect the quality of the human environment," thus trigger-

---

**6.** In the MBTA context, the term "depredation" is used with reference to predatory migratory birds. The regulations allow for permits to kill birds labeled depredatory under certain circumstances. *See* 50 C.F.R. § 21.41(a) ("a depredation permit is required before any person may take, possess, or transport migratory birds for depredation control purposes").

ing the statutory requirement that an EIS be prepared. 40 C.F.R. § 1501.4(b). An EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required [by the statute], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9.

The question of whether a proposed action will "significantly affect the quality of the human environment" "requires considerations of both context and intensity." 40 C.F.R. §§ 1501.4(b), 1508.27. The applicable regulations further define these terms as follows:

(a) Context ... means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant....

(b) Intensity ... refers to the severity of impact ...

*Id.*

With respect to intensity, the regulations go on to identify a number of factors, dubbed "significance factors," which "should be considered in evaluating intensity":

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27(b).

Some courts have found that "[t]he presence of one or more of these factors should result in an agency decision to prepare an EIS." *Pub. Citizen v. Dep't of Transp.,*

316 F.3d 1002, 1023 (9th Cir.2003) ("If agency's action is environmentally 'significant' according to any of these criteria [set forth in 40 C.F.R. 1508.27(b) ], then DOT erred in failing to prepare an EIS."); *see also Anderson v. Evans,* 314 F.3d 1006, 1021 (9th Cir.2002) (holding, after consideration of a single "significance factor," that an EIS was required); *Pub. Serv. Co. of Colo. v. Andrus,* 825 F.Supp. 1483, 1495 (D.Idaho 1993); *but see Born Free USA v. Norton,* Civil Action No. 03–1497, 279 F.Supp.2d 5, 2003 WL 21871640, *16 (D.D.C. Aug.8, 2003) (calling *Andrus* into question).

## IV. Motion for Preliminary Injunction

### A. *Standard of Review*

■ In order to succeed on a motion for preliminary injunction, plaintiffs carry the burden of demonstrating (1) a substantial likelihood of success on the merits, (2) irreparable injury if the injunction is not granted, (3) that there will be no substantial injury to other interested parties, and (4) that the public interest would be served by the injunction. *Born Free USA v. Norton,* 2003 WL 21871640 at *3; *see also Katz v. Georgetown University,* 246 F.3d 685, 687–88 (D.C.Cir.2001); *Wash. Metro. Area Transit Comm'n v. Holiday Tours,* 559 F.2d 841, 842–44 (D.C.Cir.1977). No one factor is determinative. Rather, "[t]hese factors interrelate on a sliding scale and must be balanced against each other." *Serono Laboratories, Inc. v. Shalala,* 158 F.3d 1313, 1318 (D.C.Cir.1998); *see also CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C.Cir.1995) ("If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak."). A court may accept a modified showing of the substantial likelihood of success on the merits, and grant injunctive relief upon a lesser showing of a "substantial case on the mer-

its," where "the other three factors strongly favor interim relief." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d at 843; *cf. Cuomo v. United States Regulatory Comm'n,* 772 F.2d 972, 974 (D.C.Cir.1985). Conversely, where a party can demonstrate "probable success on the merits," the party need only establish a "possibility of irreparable injury." *See Wash. Metro. Area Transit Comm'n v. Holiday Tours,* 559 F.2d at 841; *see also Cuomo v. United States Regulatory Comm'n,* 772 F.2d at 974.

■ Recognizing that "[i]t is undisputed that the granting of preliminary injunctive relief is an extraordinary measure, and that the power to issue such exceptional relief 'should be sparingly exercised,' " this Court nevertheless finds that plaintiffs have met their burden of establishing that injunctive relief is warranted in this case. *See Experience Works v. Chao,* 267 F.Supp.2d 93 (D.D.C.2003) (citing *Dorfmann v. Boozer,* 414 F.2d 1168, 1173 (D.C.Cir.1969)). Because plaintiffs have made a compelling showing of irreparable harm, thereby reducing their burden of persuasion with respect to the other factors to be considered when adjudicating a motion for injunctive relief, the Court will first consider the harm to plaintiffs which would arise in the absence of injunctive relief.

### B. *Irreparable Harm*

The parties are at considerable odds with respect to how irreparable harm should be measured in this case. Plaintiffs take a broad view, and assert that, when all of the depredation permits contemplated by the Final EA are considered, 67% of the mute swans currently found in the Atlantic Flyway, and 86% of the mute swans in Maryland, are at risk of being killed. Pls.' Mot. at 41 (citing Final EA at 30). Based on their calculations, plaintiffs

maintain that it is incontrovertible that their ability to view, interact with, study, and appreciate mute swans will be affected by defendants' actions, and therefore irreparable harm to their aesthetic interests will ensue. *Id.* Additionally, plaintiffs assert irreparable harm premised on violation of their procedural rights under NEPA.

Defendants counter that the only conduct relevant to the adjudication of the pending motion for preliminary injunction is FWS' issuance of a permit authorizing Maryland to kill 525 swans between August 27, 2003 and December 31, 2003, because applications for future permits submitted by the State of Maryland, or any other state for that matter, will be reviewed individually to determine if the annual maximum take limits should be adjusted upward or downward. Def.'s Opp'n at 16, 36, MDNR Opp'n at 21–22.[7] Defendants further contend that reduction of the current Maryland mute swan population of 3600 swans by 525 individuals will result in minimal harm to plaintiffs' interests. MDNR Opp'n at 21, 22 ("Lethal removal of 525 out of 3,600—or 14.5%—will only result in a minimal disturbance of plaintiffs' opportunities for swan viewing."). MDNR, in its brief in opposition to plaintiffs' motion, now specifies that it plans to "take" the 525 swans in question from "remote areas" where plaintiffs have not alleged that they live or travel, and therefore plaintiffs will suffer no irreparable harm whatsoever from the action authorized by the challenged permit. MDNR Opp'n at 22, n. 10.

It appears that, even if defendants' narrower view is adopted, plaintiffs nevertheless meet their burden of demonstrating irreparable harm. In *Fund for Animals v. Clark,* the District Court granted a preliminary injunction based on the irreparable harm to plaintiffs caused by defendants' "failure to comply with NEPA and the aesthetic injury the individual plaintiffs would suffer from seeing *or contemplating* ... bison being killed in an organized hunt." *Fund for Animals v. Clark,* 27 F.Supp.2d 8, 14 (D.D.C.1998) (emphasis added); *see also Fund for Animals v. Glickman,* Civil Action No. 99–245, Tr. of Hr'g Mot. for T.R.O. at 57–58 (D.D.C. Feb. 12, 1999) (granting temporary restraining order enjoining initiation of deer hunt where plaintiffs alleged NEPA violations in process leading up to authorization of hunt; finding that plaintiffs had "clearly established that there would be irreparable harm" to their interest in observing the animals in the area as a result of agency action). In that case, plaintiffs who "enjoy observing, photographing, and generally commiserating" with bison found on federal parklands in Wyoming challenged FWS' authorization of a "controlled hunt" aimed at managing the size of the bison herd on federal lands. *Id.* at 9, 14. The hunt in question would have involved the killing of 35–40 of the 435 animal herd, a percentage considerably smaller than that implicated by defendants' proposed action in this case.[8] *Id.* at 10, 15. Nevertheless, the

---

7. In the alternative, defendants submit that the EA authorizes a total take in the Atlantic Flyway of a maximum of 3,100 swans per year, or that which will bring the total flyway population down to its 1986 level of 4,675 birds, whichever is less, amounting to far smaller percentage of the current Flyway population than suggested by plaintiffs. Def.'s Opp'n at 16, 17–18, 22.

8. 35 of 435 bison is approximately 8% of the herd, while 525 of 3600 mute swans is approximately 14% of the total mute swan population of Maryland by defendants' calculations. *See* Def.'s Opp'n at 36.

District Court in *Clark* impliedly found that reduction of the herd by a relatively smaller proportion of animals than envisioned in this case would have an appreciable and irreparable impact on plaintiffs' interests. *See also Sierra Club v. Martin*, 933 F.Supp. 1559, 1570–71 (N.D.Ga.1996) (finding irreparable harm in MBTA/APA action, noting that "the question of irreparable injury does not focus on the significance of the injury, but rather, whether the injury, irrespective of its gravity, is *irreparable*—that is whether there is any adequate remedy at law . . . In the instant case, once the migratory birds are killed, they cannot be returned . . . [and] no monetary award can recompense Plaintiffs for the birds' deaths. . . . nowhere in the text of the MBTA does it state that a violation of its mandate is contingent upon a finding of a killing of a certain percentage of the migratory bird population in a particular location.").

Similarly, in *Fund for Animals v. Espy*, the District Court enjoined a program which would have removed 10 to 60 bison from the same bison herd, based in part on the irreparable harm such action would cause plaintiffs who enjoyed the bison "much the same way as a pet owner enjoys a pet, so that the sight, *or even the contemplation*, of treatment in the manner contemplated . . . would inflict aesthetic injury upon the individual plaintiffs . . . not compensable in money damages . . . Thus, the injury experienced and threatened would be irreparable." *Fund for Animals v. Espy*, 814 F.Supp. 142, 151 (D.D.C.1993); *see also Fund for Animals v. Glickman*, Civil Action No. 99–245, Tr. Hr'g Mot. for T.R.O. at 58 (Feb. 12, 1999) (basing grant of injunctive relief on "the final irreparable injury which cannot be quantified in any way at all . . . that we would be killing animals, and that there is no way of rectifying that injury if, in fact, two months down the line . . . the court

concludes that the agency has acted in . . . an illegal fashion.").

It is also notable that the District Courts found irreparable harm in the *Clark, Espy,* and *Glickman* cases even though plaintiffs did not establish that the exact animals they regularly observed would be directly affected by the proposed action. *See* MDNR Opp'n at 20, n. 7, 22, Ex. 1, Hindeman Decl. ¶¶ 26, 28 (suggesting that swans will primarily be killed in "remote locations" "in the lower Bay, south of Rock Hall on the Eastern Shore" where plaintiffs are less likely to observe or interact with swans or suffer emotional harm from viewing a swan killing or dead swan). Furthermore, the District Courts in those cases found aesthetic injury based on the mere *contemplation* of a particular treatment of the animals in question, thereby undercutting defendants' argument that plaintiffs cannot assert irreparable harm based on "removal" of swans from the viewing population when they are themselves involved in efforts to remove swans by relocating them to Europe. *See* MDNR Opp'n at 21 n. 9.

MDNR's contention that plaintiffs' failure to allege irreparable emotional harm arising from the issuance of depredation permits to other states in the Atlantic Flyway authorizing the killing of close to 1,000 mute swans this year is fatal to their claim of irreparable harm in this case is without merit. *See* MDNR Opp'n at 19 n.7. Plaintiffs in this case claim, for the purposes of their request for injunctive relief precluding action pursuant to the Maryland permit, to have developed relationships with and aesthetic interests in particular swans located in Maryland, not with all swans in the Atlantic Flyway.

Similarly, MDNR's argument that plaintiffs have made no allegations nor presented any evidence that they have

been traumatized by past mute swan killings in Maryland, including the killing of more than 1,700 mute swans in 2002, ultimately fails. *See* MNDR Opp'n at 19 n.7. Plaintiffs are claiming that they will suffer irreparable harm from the killing of an *additional* 525 mute swans, some of which may be those with which they have developed relationships, or have observed and plan to observe again in the future. Defendants have cited no authority suggesting that such an allegation of harm is insufficient based on failure to raise similar challenges in the past.

Finally, although defendants appear to be correct in their assertion that the procedural harm arising from a NEPA violation is insufficient, *standing alone*, to constitute irreparable harm justifying issuance of a preliminary injunction, when combined with the irreparable aesthetic injuries alleged by plaintiffs, such procedural harm does bolster plaintiffs' case for a preliminary injunction. *See Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (holding that there could be no *presumption* of irreparable harm based on a statutory violation, yet finding that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely ... the balance of harms will usually favor issuance of the injunction to protect the environment."); *Fund for Animals v. Clark*, 27 F.Supp.2d at 14.

Accordingly, the Court concludes that plaintiffs have clearly met their burden of establishing the existence of substantial irreparable harm to their interests absent the grant of injunctive relief maintaining the *status quo* during the pendency of this action.

### 2) *Substantial harm to other parties*

Defendants next argue that, even if the Court finds that plaintiffs have demonstrated irreparable harm should Maryland be allowed to act on its mute swan depredation permit, the harm to the state which would result from this Court's grant of injunctive relief outweighs that alleged by plaintiffs. *See* Def.'s Opp'n at 37–40; MDNR Opp'n at 30–32. The Court disagrees, finding that defendants have not demonstrated substantial, much less irreparable, harm to the interests of either the state of Maryland or the federal government should action pursuant to the permit be delayed for a short period of time pending resolution of this case on the merits.

MDNR submits that the Chesapeake Bay "is the State of Maryland's most important natural resource and its health is of vital importance to the People of the State of Maryland." MDNR Opp'n at 23. Defendants further argue that grant of injunctive relief precluding the state of Maryland from acting on its August 11, 2003 permit will cause irreparable harm to the Chesapeake Bay and native wildlife due to the daily degradation of SAV which will be caused by the existing population of mute swans, as well as by any increase in population arising from mating among the additional 525 swans that would survive into the coming year. MDNR Opp'n at 25, Ex. 1 (Hindman Decl.) ¶ 29 (submitting that failure to kill an additional 525 swans this year will result in as many as 250 additional breeding pairs in 2004 that will consume upwards of 2 million pounds of SAV and generate 1000 or more cygnets, ultimately "irretrievably" expanding the breeding population in three or four years); Def.'s Opp'n at 38–39.

Defendants' repeated references to the potential for further exponential growth in the mute swan population if the state of Maryland is not permitted to proceed with

killing 525 swans in the next few weeks are, to say the least, somewhat premature. Such considerations only become relevant if this case does not proceed to a merits determination for a prolonged period of time. *See* Def.'s Opp'n at 37, MDNR Opp'n at 26 (referring to projected mute swan population of 20,000 in 2010). Currently, the mute swan population is growing at a rate of 9.2% per year, hardly an unmanageable rate should the agency's proposed course of action be delayed by a year. *See* Final EA at 69–70. According to defendants, SAV volume in the Chesapeake Bay has been decreasing over the last *30 years*, and several administrative bodies cited to by defendants have been calling for a reduction in the mute swan population for almost three years. Def.'s Opp'n at 38. Surely waiting a few months to ensure vindication of the public's interest in compliance with NEPA and the MBTA will not so damage the Chesapeake Bay as to counterbalance the irreparable harm claimed by plaintiffs, particularly given that the current population of mute swans in the Bay arguably consumes only 10% of the total annual Chesapeake Bay SAV biomass. *See* Final EA at 3; *cf. Animal Protection Institute v. Stanton,* Civil Action No. 97–2563 Tr. Hr'g Mot. Prelim. Inj. at 62 (D.D.C. Dec. 10, 1997) (noting that government had shown a degree of harm in not being able to proceed with deer population control measures during the upcoming winter season, but nevertheless granting preliminary injunctive relief given the "public interest in making sure that agencies comply with [their] statutory responsibility ... under NEPA."). In fact, MDNR officials have gone so far as to describe the "bay-wide" impact of mute swans as "negligible," although localized effects are alleged to be quite significant. *See* Pls.' Mot. at 43, Ex. 38, e-mail from Mike Naylor to Edith Thompson, *et al.* (October 18, 2000), Ex. 41, Letter to Bette Stallman from Paul Peditto, Director, Wildlife and Heritage Service, MDNR ("bay-wide impacts of the collective Maryland mute swan population are negligible at current numbers.") (Sep. 23, 2002).

As for MDNR's somewhat overwrought and repeated assertions that it must be allowed to act on its August 11, 2003 permit *immediately* in order to capitalize on the current molting season in an effort to safely kill, in the words of MDNR counsel at oral argument "the most swans in the shortest period of time with the resources available," [9] it appears undisputed that the molting season will inevitably come again next year. *See* MDNR Opp'n at 26; Hindman Decl. ¶¶ 25–27. Moreover, MDNR's counsel conceded at oral argument that Maryland has already killed 100 swans this year and 1,700 last year pursuant to permits issued by FWS prior to performance of the EA, and therefore has already been able to achieve at least part of its goal during this and the previous calendar year. MDNR has offered no compelling reason why it could not similarly take additional swans outside of the molting season following an expedited resolution of this case on the merits. In essence, MDNR's counsel argued at the hearing on the motion for preliminary injunction that it must be permitted to proceed immediately simply because it would be "easier" to take swans now than at any other time. While the ease of carrying out state objectives is an important consideration, it does not, by any stretch of the imagination, rise to the level of irreparable or even substantial harm.

Defendants' contention that "the longer the clock ticks, the more out-of-balance

---

9. Molting birds are flightless and congregate in large numbers.

and difficult to restore the system becomes" is a valid one, but their assumption that a brief delay while awaiting a resolution of plaintiffs' claims on the merits will cause irreparable harm is unfounded. If, upon consideration of the merits of plaintiffs' claims, this Court concludes that both the issuance and implementation of Maryland's mute swan depredation permit are proper and warranted by the record, defendants may appropriately adjust upward the number of swans for which they seek lethal take depredation permits in the future in order to achieve their goal. Furthermore, issuance of an injunction prohibiting Maryland from killing any mute swans this year would not preclude the state from pursuing "non-lethal" population management techniques such as egg addling, which they already intend to use as part of an integrated management plan, and which have proven effective in the past, although not as effective as killing swans, and more "difficult." *See* Final EA, Hindman Decl. ¶ 13.

Conversely, if defendants are allowed to proceed with their proposed action, 525 swans will irretrievably be lost. Therefore, this is not a scenario such as that in *Sierra Club v. Block*, relied upon by MDNR, in which either pursuing the proposed course of action or not pursuing it will both result in losses of varying magnitude to the same natural resource, but rather one in which the harm to defendants is more easily mitigated and remedied. *See Sierra Club v. Block*, 614 F.Supp. 134, 137 (E.D.Tex.1985) (balancing irreparable losses which would arise from failure to cut pine trees infested by pine beetles against those which would result from cutting pine trees to control the infestation); *see also S. Utah Wilderness Alliance v. United States Forest Serv.*, 897 F.Supp. 1394, 1398 (D.Utah 1995) (same). Accordingly, defendants have failed to establish a substantial likelihood of harm to other parties which outweighs the irreparable harm established by plaintiffs.

### C. *Likelihood of Success on the Merits*

#### 1. *NEPA*

##### a) Standard of Review

An agency finding of no significant impact (FONSI) for a proposed course of action and its attendant conclusion that an EIS is not required under NEPA may be overturned "only if it was arbitrary, capricious or an abuse of discretion." *Town of Cave Creek, Arizona v. Fed'l Aviation Ass'n*, 325 F.3d 320, 327 (D.C.Cir.2003); *Sierra Club v. United States Dep't of Transp.*, 753 F.2d 120, 126 (D.C.Cir.1985). The D.C. Circuit has adopted a four part test to guide judicial review of an agency's finding that a proposed action will not "significantly affect the quality of the human environment" as that language is used in NEPA. *Town of Cave Creek, Arizona v. Fed'l Aviation Ass'n*, 325 F.3d at 327; *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340–41 (D.C.Cir.2002); *Sierra Club v. Peterson*, 717 F.2d 1409, 1413 (D.C.Cir.1983). Courts are directed to examine

> (1) whether the agency took a "hard look" at the problem; (2) whether the agency identified the relevant areas of environmental concern; (3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and (4) if there was an impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum.

*Town of Cave Creek, Arizona v. Fed'l Aviation Ass'n*, 325 F.3d at 327; *Grand Canyon Trust v. FAA*, 290 F.3d at 340–41; *Sierra Club v. Peterson*, 717 F.2d at 1413.

■ Plaintiffs contend that FWS' decision to issue a FONSI and not to proceed with an EIS further evaluating the environmental impacts of depredation permits allowing for lethal take of mute swans is arbitrary and capricious and contrary to NEPA on several grounds. Pls.' Mot. at 13, 15–20. Defendants assert that the Final EA meets all of NEPA's requirements by describing the proposed action, examining reasonable alternatives, including those proposed by plaintiffs (no action and egg addling), considering environmental impacts, and providing a list of individuals and agencies consulted. *See* 40 C.F.R. § 1508.9; Def.'s Opp'n at 17–18, 27–29.

Plaintiffs advance several arguments in support of their contention that, notwithstanding the FWS' expressed rationale for issuing a FONSI, its action should be set aside under the applicable four-pronged test. Without reaching any final conclusion on their merits, the Court finds that, as a whole, these arguments present a "substantial case on the merits" sufficient to warrant the grant of injunctive relief in light of plaintiffs' compelling showing of irreparable harm. *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d at 843.

b) "Hard look" requirement

■ FWS maintains that it took a "hard look" at the alternatives for managing the mute swan population, and, after carefully

considering the information available to it, identified seven reasons why a FONSI was warranted:

◇ the plan would not eradicate the mute swan population in any state;

◇ the plan posed no risk to the survival of the mute swan population in the Atlantic Flyway;

◇ the plan posed no threat to the viability of the mute swan population in North America or worldwide;

◇ the plan would help preserve the *status quo* in terms of SAV density and prevent further harm to other wildlife and commercially valuable species dependent on SAV;

◇ the plan minimized the risk of emotional trauma and physical injuries to humans; and

◇ the plan would not eliminate mute swan viewing opportunities.

Def.'s Opp'n at 21–22; 68 Fed.Reg. 47085.

Notwithstanding these proffered justifications for its conclusions, the Court finds, for the following reasons, that defendants did not take the requisite "hard look" at the identified problem and proposed alternatives.

### i) Public Involvement

Although there is no statutory requirement under NEPA that an agency engage in public notice and comment prior to issuing a final EA, a FONSI, or both,[10] the regulations provide that

---

10. *See Como Falcon Comm'y Coalition v. Dep't of Labor*, 609 F.2d 342, 345 (8th Cir. 1979) ("Sometimes it may be advisable for the agency to provide for public input and opinion through a public hearing and in weighing the reasonableness of the agency action the court may consider the opportunity of the public, through hearings or otherwise, to make their views known and to make input into the decision. But there is no statutory requirement that the agency provide such an opportunity, or an opportunity of a particular kind, and we are unwilling by judicial deci-

sion to legislate such a requirement into the Act."); *see also Nat'l Ass'n of Gov't Employees v. Rumsfeld*, 418 F.Supp. 1302, 1307 (E.D.Pa. 1976) ("The statute does not impose any public participation requirement upon the threshold process of deciding whether NEPA applies at all, nor have we discovered any regulations concerning public participation in the environmental assessment stage."); *but see Anderson v. Evans*, 314 F.3d at 1016 ("The public must be given an opportunity to comment on draft EAs and EISs, and public hear-

NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken ... public scrutiny [is] essential to implementing NEPA.

40 C.F.R. § 1500.1(b). They go on to state that federal agencies

shall to the fullest extent possible ... [e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment, ....

40 C.F.R. § 1500.2. The regulations further propose no fewer than nine alternate means of providing notice to the public where a proposed action will, like this one, primarily implicate local concerns. 40 C.F.R. § 1506.6(b)(3); *see also Human Soc'y of the United States v. Glickman,* Civil Action No. 98–1950, Tr. Hr'g Mot. T.R.O. at 11 (D.D.C. Jun. 23, 1998).

The Court finds that FWS provided the public with insufficient information regarding the proposed action and its potential environmental impacts and insufficient time in which to comment on the Draft EA. Accordingly, the agency's approach to public involvement and consideration of what public input it did receive do not support a finding that it took a "hard look" at the problem and alternative means of addressing it.

Plaintiffs correctly point out that the public was provided with only two weeks, including an intervening holiday long weekend, or a total of nine working days, in the middle of the summer months, to review the EA and prepare and submit comments to the agency.[11] Pls.' Mot. at 27. The final EA was prepared over a two week period between July 16 and July 31, 2003.

Although neither the statute nor the regulations prescribe any length or scope of public comment on a draft environmental assessment, courts have granted injunctive relief based at least in part on a likelihood of success on the merits of NEPA challenges to similarly lacking public comment procedures. *See Fund for Animals v. Glickman,* Civil Action No. 99–245, Tr. Hr'g Mot. for T.R.O. at 59–60 (Feb. 12, 1999) (holding that, where an environmental assessment was prepared in six days, and the public comment period was approximately eight working days, "those kinds of time frames do not allow for any meaningful input even though a couple of dedicated people may have managed."); *Save Our Ecosystems v. Clark,* 747 F.2d 1240, 1247 (9th Cir.1984) (holding five day public comment period on a portion of an EA insufficient, remanding for further public comment); *cf. Wroncy v. Bureau of Land Management,* 777 F.Supp. 1546, 1548 (D.Or.1991) (finding likelihood of success on the merits and granting temporary restraining order based on finding that agency appeared to have made "no effort to make public the environmental assessment ... in which the [agency] concluded that there would be no significant environmental impact as a result of the ... project."); *Friends of*

---

ings are encouraged to facilitate input on the evaluation of proposed actions."); *Sierra Club v. Watkins,* 808 F.Supp. 852 (D.D.C.1991).

**11.** Plaintiffs further indicate that a number of individuals, organizations, and members of Congress asked for more time, asserting that the public comment period was "insufficient ... to provide complete and thorough comments on the assessment." Pls.' Mot. at 27,

Ex. 22, Letter from Van Hollen to FWS (July 11, 2003, Ex. 23, Letter from Sarbanes to Williams (July 17, 2003)); Pls.' Reply at 9 n.5. The FWS' apparent sudden rush to judgment in the face of manifest public interest in participating in the NEPA process, based on "time constraints," the source of which is never truly identified, is somewhat puzzling. *See* Def.'s Opp'n at 30; Pls.' Reply at 9 n.5.

*Walker Creek Wetlands, Inc. v. Bureau of Land Mgmt.,* 19 Envtl. L. Rep. 20852, 20852 (D.Or.1988) (holding that the agency failed to provide for any public participation in the EA process and ordering 45 day period for public comment on EA).

Defendants simply respond that plaintiffs have not established that FWS did not consider any information submitted during the public comment period. FWS further asserts that it received and reviewed "thousands of comments" from 13 state wildlife agencies, 53 organizations, and 2,620 individuals during the period between the July 16, 2003 comment submission deadline and July 31, 2003, the date the Final EA was published.[12] Def.'s Opp'n at 7. Moreover, it submits that the administrative record "contains hundreds of documents." *Id.* at 21. The Court finds that these facts cut in favor of plaintiffs, not defendants, as it is hard to believe that review of such a substantial volume of material within such a short time frame meets the requirement that the agency take a "hard look" at the problem. *See Sierra Club v. Peterson,* 717 F.2d at 1413; *see also* AR Vol. 1 at 84, May 21, 2003 e-mail from John Trapp forwarding outline of Draft EA (noting that "most of the stuff has already been written for us and is available in other documents. It will largely be a matter (I think) of *cutting and pasting.*" (emphasis added)).

Plaintiffs also argue that the Draft EA did not disclose information critical to meaningful public participation, including details regarding (1) which local environments will be affected by the issued permits, (2) how many birds will be killed at individual sites, (3) the precise harms caused by birds at particular sites, and (4) local environmental impacts of killing swans at those sites. Pls.' Mot. at 21. They further submit that absence of information regarding the sites at which the activities authorized by the permit will be carried out precludes meaningful evaluation of the effectiveness of the agency's proposed action in achieving its stated goals, as well as the availability of alternatives. Pls.' Mot. at 23; *cf. Gerber v. Norton,* 294 F.3d 173, 179 (D.C.Cir.2002) (finding notice and comment prior to issuance of a Habitat Conservation Plan and Incidental Take Permit pursuant to the Endangered Species Act was inadequate under the APA because the agency failed to provide the public with information about the specific site at which mitigation was to take place, thereby precluding meaningful opportunity for public comment).

It appears that plaintiffs are correct in this regard—both the Draft EA and the Final EA describe the "[l]ocation of the action" only as "17 States in the Atlantic Flyway." Draft EA at 11; Final EA at 12. The agency's rationale for not providing more location-specific information, namely that the mute swan is "legally" classified as a migratory bird, is completely undermined by its assertion, in the very next sentence, that individual birds rarely travel more than 30 miles from one location. Draft EA at 11; Final EA at 12. As far as the Maryland permit is concerned, plaintiffs are correct that defendants' assur-

---

**12.** FWS reports that 43 of the 53 organizations who participated in the public comment period supported issuance of depredation permits, including organizations dedicated to bird and wildlife conservation such as the National Audubon Society, the American Bird Conservancy, and the Defenders of Wildlife, as well as a number of Maryland-based organizations. Def.'s Opp'n at 7. Conversely, 10 "animal rights" organizations and 2,589 individuals, many of whom submitted web-based e-mail comments from plaintiff Fund for Animals' World Wide Web site, opposed issuance of the permits on the grounds that the proposed action is not supported by scientific evidence and is inhumane. *Id.* at 7–8.

ances that more detailed information regarding the precise locations at which the swan killing will take place will become available during the permitting process ring hollow in light of the Maryland permit's broad scope, covering 15 of 24 counties within the state. *See* Pls.' Mot. Ex. 41, Letter from Peditto to Stallman (Sep. 23, 2002) ("We will not designate all potential 'swan free areas' in this plan because that is not knowable and will evolve over time. We will engage local communities and stakeholder groups in decisions made about where and how to manage mute swan populations wherever this is appropriate and necessary.")

MDNR's contention at oral argument that all of the publicaly available information regarding Maryland's approach to mute swan management, taken together, would have provided an interested member of the public with the information necessary to determine which local sites would primarily be affected by the Maryland permit, is completely unpersuasive.[13] *See also* Pls.' Mot. Ex. 41, Letter from Peditto to Stallman (Sep. 23, 2002) ("The information used to develop the plan is and has been available to the public ever since the Mute Swan Task Force disbanded in December 2000.") The fact that supplemental information submitted by MDNR in support of its permit application, which defendants contend provides the requisite level of specificity, was received by FWS on July

18, 2003, two days after the EA public comment period closed, and was ultimately never disclosed to the public, renders this argument all the more untenable. *See* July 11, 2003 Addendum to Application for Federal Depredation Permit (rec'd July 18, 2003); Def.'s Opp'n at 33; MDNR Opp'n at 14; *see also Anderson v. Evans*, 314 F.3d at 1014–15 (permittee amended management plan before final EA issued but after close of public comment period; court noted with disapproval that there was "no opportunity for public comment on [these] important amendments"). Furthermore, Maryland's narrowing of the scope of its permit application from a state-wide permit to one covering 6000 square miles and 15 of 24 counties within the state did not translate into any greater specificity as to the effects of the proposed action on local mute swan populations. Defendants' citation to maps identifying with greater specificity areas where "mute swans may most reasonably be found in Maryland," as well as where they have been found in the past, brings members of the public no closer to information as to the local effects of killing 525 mute swans somewhere in those areas. *See* March 13, 2003 MDNR Permit Application and attachments; July 3, 2003 MDNR Permit Application and attachments.

In any event, it is clear from the record that the agency's efforts to ensure meaningful public involvement in the EA pro-

---

**13.** Furthermore, the materials cited to by defendants do not provide the vaunted level of specificity regarding the areas that are likely to be affected by the proposed action. For instance, *Mute Swans in Maryland: A Statewide Management Plan* (April 14, 2003), merely describes *types* of areas from which "[a]ll mute swans will be either excluded or removed," such as "[i]mportant SAV beds," SAV transplanting sites, publicaly owned wetlands, colonial waterbird nesting sites, and black duck nesting sites. *Mute Swans in Maryland: A Statewide Management Plan* (April

14, 2003), Appendix D. Although there are maps indicating where some of these locations are, there is no specific information regarding approximately how many swans will be taken from each location and what the local environmental impacts of such takings will be. Similarly, the attachments to MDNR's March 13, 2002 permit application refer to the "Swan Free Areas" identified in *Mute Swans in Maryland: A Statewide Management Plan* (April 14, 2003), again describing *types* of areas where mute swans will be killed, but providing no further details.

cess were deficient, and appear to have been primarily *pro forma.* Accordingly, the Court finds that plaintiffs have established a "substantial case on the merits" that the agency's compliance, or lack thereof, with regulations directing agencies to ensure public involvement in environmental decision-making "to the greatest extent possible" belies its claim that it took the "hard look" required to avoid a finding that a FONSI was arbitrary, capricious, and contrary to law.

### ii) Post-hoc rationalization

Plaintiffs further submit that, because the FWS had already issued 14 permits prior to performance of the EA, all of which, with the exception of Maryland's, remained outstanding during the EA process, the NEPA process was a fruitless exercise designed to rationalize a decision already made. Pls.' Mot. at 10, 13–15; *see* 40 C.F.R. § 1502.5 ("an environmental impact statement ... shall be prepared early enough so that it can serve practically as an important contribution to the decision-making process and will not be used to rationalize or justify decisions already made."); *Metcalf v. Daley,* 214 F.3d 1135, 1143 (9th Cir.2000) ("In terms of timing and importance to the goals of NEPA, we see no difference between an EA and an EIS in connection with when an EA must be integrated into the calculus."); *but see* 40 C.F.R. § 1501.3 ("Agencies may prepare an environmental assessment at any time in order to assist agency planning and decisionmaking.").

Plaintiffs contend that such *post-hoc* rationalization of pre-determined action renders the agency's conduct arbitrary and capricious because it does not meet the requirement that the agency take a "hard look" at the problem before making a decision not to undertake an EIS. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 348, 109 S.Ct.

1835, 104 L.Ed.2d 351 (1989); *Sierra Club v. Peterson,* 717 F.2d at 1413. Defendants respond that, because the permits could be revoked if the findings of the EA suggested an EIS was warranted, issuance of the permits in question did not constitute an "irreversible and irretrievable commitment of resources" prior to performance of an EA, and therefore does not run afoul of NEPA. *See Metcalf v. Daley,* 214 F.3d at 1143 (regulations require agencies to prepare NEPA documents, including environmental assessments, "before any irreversible and irretrievable commitment of resources.") (citations omitted).

However, defendants overlook the fact that, to the extent that permits contemplated by the EA were outstanding during the performance of the EA, states could have killed mute swans, and no doubt in some cases did, thereby engaging in an "irreversible and irretrievable commitment of resources." *See id.* (holding that such an impermissible commitment occurred where federal agency entered into a contract with an indigenous tribe to authorize and fund whaling activities prior to preparing an environmental assessment of the impacts of such activities); *see also Save the Yaak Comm. v. Block,* 840 F.2d 714, 718–19 (9th Cir.1988) (contracts awarded prior to preparation of EA); *Thomas v. Peterson,* 753 F.2d 754 (9th Cir.1985) (holding that building a road in order to facilitate timber sales and subsequently preparing an EA/EIS to evaluate the impact of timber sales "swings the balance decidedly in favor of timber sales," and was therefore impermissible under NEPA); *Fund for Animals v. Glickman,* Civil Action No. 99–245, Tr. of Hr'g on Mot. for T.R.O. at 61 (Feb. 12, 1999) (finding that, where "agency had essentially locked itself into a position which bound it to a certain course of action ... before it had completed its NEPA review," plain-

tiffs had demonstrated substantial likelihood of success on the merits of their NEPA claim).

As in the cited cases, issuance of the permits in question prior to conducting an EA "amounted to a surrender of the Government's right to prevent activity in the relevant area" within the scope and duration of the permit. *See Metcalf v. Daley,* 214 F.3d at 1144. This is not a case in which the agency merely contemplated the issuance of depredation permits prior to embarking on an EA which ultimately recommended such a course of action. *See Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 892 (9th Cir.2002) ("contemplation" of a course of action in a memorandum written prior to EA "does not amount to a NEPA violation unless the . . . memorandum committed [the agency] to the amendments proposed.").

Defendants' claim that FWS' actions are "entitled to a presumption of regularity" does not overcome these arguments that defendants failed to take the requisite "hard look" at the proposed action before issuing a FONSI, particularly because "that presumption does not shield [agency] action from a thorough, probing, in-depth review." *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The Court finds that plaintiffs have sufficiently established that, upon a "thorough, probing, in-depth review" of the merits of this case, there is a likelihood that they will succeed in demonstrating that the "hard look" prong of this Circuit's standard of review of agency FONSIs was not met.

### c) Identification of relevant areas of environmental concern

 The FONSI states that "[t]he primary goal in implementing this action is to minimize environmental damages attrib-

uted to mute swans . . . [a] secondary goal—and the most effective means for achieving the first goal—is to reduce populations of feral mute swans to pre–1986 levels." 68 Fed.Reg. 47,084.

As an initial matter, plaintiffs submit that the FWS' proposed alternative of issuing depredation permits allowing the killing of mute swans is not a reasonable means of addressing the "principal" environmental damage alleged to be caused by mute swans, namely decreases in SAV volume. In support of this argument, plaintiffs cite to the Final EA itself, which concludes that mute swans are not "the primary, or even a major, reason for the decline in [SAV] in the Chesapeake Bay or anywhere else." *See* Final EA at 77. Rather, the Final EA states that "pollution and other anthropogenic factors are largely responsible for long-term declines in the abundance of SAV." *Id.*

Defendants correctly respond that this fact is not relevant to the Court's review, given that the administrative record supports the conclusion that mute swans present at least some threat to the environment through their consumption of SAV. *See* Opp'n at 28–29. This provides the justification necessary for the agency to pursue a course of action designed to minimize the effects of mute swans on the environment, however slight. Furthermore, the primary goal of the proposed action is to "minimize the environmental damages attributed to mute swans," by reducing the population of mute swans, not to address all of the causes of SAV depletion. Def.'s Opp'n at 18, 28. Accordingly, the Court finds that the agency has sufficiently identified the problem, and that there is a sufficient nexus between the proposed action and the agency's stated purpose such that the agency's action is not arbitrary,

capricious, or contrary to law.[14]

### d) Convincing case that the impact was insignificant

■ Plaintiffs contend that defendants have failed to provide "convincing reasons why potential impacts are truly insignificant" as required by NEPA because a number of the "significance factors" the NEPA regulations direct agencies to consider exist with respect to the proposed action. Pls.' Mot. at 10, 18; *NRDC v. Herrington*, 768 F.2d 1355, 1432 (D.C.Cir. 1985); *see also Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (The APA requires reviewing court to "consider whether the [agency] decision was based on a consideration of the relevant factors ....").[15] Accordingly, plaintiffs maintain that the EA should be remanded to the agency for preparation of an EIS, or, at a minimum, expanded discussion of these factors. *See* Pls.' Reply at 6 n.2; *Animal Protection Institute v. Stanton*, Civil Action No. 97–2563, Tr. Hr'g Mot. Prelim. Inj. at 55–60 (December 10, 1997) (finding likelihood on success on the merits based on agency failure to discuss at least two factors set forth in 40 C.F.R. § 1508.27); *see also Public Citizen v. Dept. of Transp.*, 316 F.3d 1002, 1023 (9th Cir.2003) ("If agency's action is environmentally 'significant' according to any of these criteria [set forth in 40 C.F.R. 1508.27], then DOT erred in failing to prepare an EIS."); *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F.Supp.2d 30, 42 (D.D.C.2000) (noting that list of significance factors is "not a checklist," but finding that the existence of several of them

14. It is noteworthy, however, that both parties appear to consider the "primary area of environmental concern" to be the destruction of SAV, and not the potential adverse environmental impacts of taking 525 mute swans. This leads the FWS to devote the vast majority of its EA to discussing mute swans alleged impacts on SAV, and a mere page and a half to discussing the potential impacts of lethal takes on the mute swan population. *Compare* Final EA, pp. 1–14 and pp. 38–39; *see Humane Soc'y of the United States v. Glickman*, Civ. A. No. 98–1950, Tr. Hr'g Mot. for T.R.O. at 13–14 (noting that the EA "hardly even identifies any environmental consequences, and the vast majority of the environmental assessment is dedicated to accounting the problems that Canada geese produce for Virginia residents and businesses."); *see also Animal Protection Institute v. Stanton*, Civ. A. No. 97–2563, Tr. Hr'g Mot. Prelim. Inj. at 57–58 (December 10, 1997) ("what was discussed primarily [in EA] is the relative merits and demerits, benefits and detriments, of the four alternatives, not so much as they affect the environmental concerns, but as they affect the best way to control the deer population."). Similarly, plaintiffs devote most of their briefs to the argument that mute swans do not appreciably affect SAV volume on a large scale, and that even localized effects have not been adequately proven. In the Court's view, once the agency has provided sufficient justification for the proposed action by alleging that mute swans have some adverse environmental effects, the appropriate focus of the EA inquiry is what environmental impacts will arise from decreasing the mute swan population either through lethal take or other means. *Humane Soc'y of the United States v. Glickman*, Civ. A. No. 98–1950, Tr. Hr'g Mot. for T.R.O. at 14 ("the purpose of the environmental assessment is not just to cite environmental factors that motivate the agency to adopt a plan of action but the environmental consequences that will likely follow from any action.").

15. Plaintiffs further submit that any supplemental discussion of the "significance factors" in defendants' papers should not be considered by the Court when determining whether defendants' discussion of these factors was adequate, as it represents *post-hoc* rationalization of the type prohibited by NEPA. Pls.' Reply at 6 n.2, citing *Missouri Pub. Serv. Comm'n v. FERC*, 234 F.3d 36, 41 (D.C.Cir.2000) ("The court does not 'give an agency the benefit of a *post hoc* rationale of counsel.'"). The Court agrees, and has not considered any discussion of the significance factors not based on that in the administrative record.

justified setting aside FONSI); *Humane Society of the United States v. Glickman,* Civil Action No. 98–1950, Tr. Hr'g Mot. T.R.O. (June 23, 1998) (remanding to agency for failure to consider significance of impacts on plaintiffs' aesthetic interests, but emphasizing that, once agency addresses relevant environmental concerns, FONSI may still be warranted); *but see Born Free USA v. Norton,* Civil Action No. 03–1497, 278 F.Supp.2d 5, 2003 WL 21871640, *16 (D.D.C. Aug.8, 2003) (holding presence of a single "CEQ" factor insufficient to conclude that plaintiffs were likely to succeed on the merits of their claim that FWS acted arbitrarily and capriciously by issuing a finding of no significant impact). Plaintiffs further submit that, so long as there are "substantial questions" as to whether an agency's actions will have a significant effect on the environment, then failure to prepare an EIS is a violation of NEPA. *See Anderson v. Evans,* 314 F.3d 1006, 1009, 1017 (9th Cir.2002).

Here, as in *Anderson,* plaintiffs "point to a number of ... significance factors [listed in 40 C.F.R. 1508.27] as pertinent to raising substantial questions concerning a possible significant effect on the environment ...." *Id.* at 1017. Specifically, plaintiffs maintain that (1) the proposed action will have a significant effect on the environment, (2) "the effects on the quality of the human environment are likely to be highly controversial," (3) "possible effects on the human environment are highly uncertain or involve unique or unknown risks," and (4) the agency's approach "may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration." *See* 40 C.F.R. § 1508.27(b)(1),(4), (5), and(6).

### i) Significant effect

The NEPA regulations stipulate that an agency should consider "[i]mpacts that may be both beneficial and adverse" when evaluating whether a proposed action will have a significant impact warranting preparation of an EIS. 40 C.F.R. § 1508.27(b)(1). Plaintiffs emphasize that defendants themselves have stated that the proposed permit will have significant beneficial impacts on the environment, and submit that this is sufficient to establish the existence of a "significant effect" triggering the requirement that the FWS prepare an EIS. *See* 40 C.F.R. § 1508.27(b)(1) ("significant effect may exist [where] on the balance the effect will be beneficial"); *Natural Res. Def. Council v. Herrington,* 768 F.2d at 1431 ("both beneficial and adverse effects on the environment can be significant within the meaning of NEPA, and thus require an EIS."). Additionally, they highlight an apparent concession in the administrative record by an FWS official, who opined that "[i]f we are truly considering 'population management' of the species, then we should consider an EIS." Pls.' Reply at 2, citing AR Vol. 1 at 135, June 18, 2003 Memorandum by Diane Pence, FWS Northeast Region Chief of the Division of Migratory Birds. Plaintiffs also cite to an affidavit submitted in support of defendants' opposition to plaintiffs' motion, in which the MDNR's "technical expert on all waterfowl matters," Larry Hindman, refers to the need to "make a significant impact" on the mute swan population this year by killing swans as authorized by the challenged permit. Hindman Decl. ¶¶ 3, 27.

Moreover, plaintiffs maintain that even if the predicted impacts of the proposed take of 525 swans on the 3,600 strong swan population of the entire state of Maryland are likely to be minimal, the impacts may be substantially greater on the local level. *See Anderson v. Evans,* 314 F.3d at 1019–20 (concluding that disappearance of gray whales from a particular area would be a

significant environmental impact, even if there is no effect on the overall coastal population). "Such local effects are a basis for a finding that there will be a significant impact . . . ." where there are substantial questions as to the effects of the proposed actions on local populations. *Id.* at 1019, 1021 (finding EIS was required where EA did not adequately address local impacts of proposed action); *Public Citizen v. Department of Transp.,* 316 F.3d at 1023 (Noting that "[t]he CEQ regulations explain that the proposed federal action must be analyzed with regard to several contexts—national, regional, and local . . . ."; setting aside EA which failed to conduct any analysis of localized effects of proposed project).

In response, defendants merely assert in a conclusory fashion in their brief that "there will not be any significant effect at all" as a result of the contemplated issuance of depredation permits authorizing the take of up to 3100 birds annually in the Atlantic Flyway, and ask the court to defer to the agency's "broad discretion" in making determinations regarding whether a proposed action will have a significant effect. Def.'s Opp'n at 23. Defendants did not provide information regarding impacts of the proposed project on local environments, limiting their description of the affected environment to "estuaries, bays, tidal rivers, and associated freshwater and saltwater wetlands . . . immediately adjacent to the coast, principally from Maine to Virginia." Final EA at 21, 24.[16] Such an approach clearly runs afoul of the regulatory direction to consider potential impacts of proposed actions at the level of "society as a whole (human, national), the affected region, the affected interests, and *the locality.*" 40 C.F.R. § 1508.27(a) (emphasis added); *cf. Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1213 ("general statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided.").

Plaintiffs therefore appear to have raised "substantial questions" with respect to whether the issuance of depredation permits allowing for lethal take of mute swans will have significant "[i]mpacts that may be both beneficial and adverse," particularly at the local level. At a minimum, they persuasively argue that those impacts have not been evaluated at the local level. Accordingly, they have demonstrated a likelihood of success on the merits of their claim that the agency's conclusion that the proposed action would not have any significant effect on the environment was arbitrary, capricious, and contrary to law.

### ii) Uncertain effects

 Agencies are directed to consider "the degree to which the possible effects [of a proposed action] on the human environment are highly uncertain . . . ." 40 C.F.R. 1508.27(b)(5). Plaintiffs likewise submit that this "significance factor" is relevant to the proposed action because its effects on local mute swans populations and local environments are not explored in the EA. Pls.' Reply at 8.

---

**16.** Defendants' claim that the EA "incorporat[es] specific population targets for specific locations" contained in other documents is inadequate to meet NEPA's requirement that agencies analyze local effects in some detail prior to issuing a FONSI. *See* Def.'s Opp'n at 19 (citing Atlantic Flyway Mute Swan Management Plan). Moreover, the cited documents do not provide any greater detail as to specific sites within the Atlantic Flyway states where depredation permits will be implemented. Rather, they provide some detail as to locations where mute swans may be found in the state of Maryland, without identifying which of those locations it intends to focus its efforts on.

As previously discussed, defendants have failed to identify the precise locations at which mute swans will be killed, the number of birds that will be killed at particular individual sites, or the environmental impacts of those killings on local communities. *See* Pls.' Reply at 8. MDNR's conclusory and offhand response that mute swans have no positive effects on the environment as non-native species, and therefore no adverse environmental effects are likely to occur at the local as a result of killing mute swans, is unpersuasive. MDNR Opp'n at 24. The Court is persuaded by the Ninth Circuit's opinion in *Anderson v. Evans* that uncertainty as to the impact of a proposed action on a local population of a species, even where all parties acknowledge that the action will have little or no effect on broader populations, is "a basis for a finding that there will be a significant impact" and setting aside a FONSI. *See Anderson v. Evans,* 314 F.3d at 1018–21; *see also Humane Society of the United States v. Glickman,* Civil Action No. 08–1950, Tr. Hr'g Mot. for T.R.O. at 14–15 (June 23, 1998) (setting aside FONSI based on conclusion that proposed action would have no effect on statewide population of Canada geese based in part on the fact that defendants had failed to address impacts on "specific, localized populations of geese" and the localized impact on plaintiffs' aesthetic interests). Therefore, the Court finds that plaintiffs have raised a "substantial question" as to whether the proposed action will have a significant impact warranting preparation of an EIS.

### iii) Precedent

In order for this significance factor to exist, the agency action must "establish a precedent for future actions with significant effects or represent[ ] a decision in principle about a future consideration." 40 C.F.R. § 1508.27(b)(6). A District Court in this Circuit recently stated that this significance factor is relevant where proposed agency action would "establish a precedent that would form 'a link in a chain of bureaucratic commitment that will become progressively harder to undo the longer it continues.'" *Fund for Animals v. Williams,* 246 F.Supp.2d at 47.

Defendants correctly contend that the issuance of the depredation permits contemplated by the EA is hardly "precedent setting," particularly because the FWS will reevaluate the scope of the permits on an annual basis. Def.'s Mot at 26–27. Furthermore, the "applications for permits are considered on an individual basis" thereby enabling the agency to "make a meaningful assessment with respect to future applications regardless of what action it has taken on the ... applications here." *See id.* at 26; *Born Free USA v. Norton,* 2003 WL 21871640 at *15; *Fund for Animals v. Williams,* 246 F.Supp.2d 27, 47 (D.D.C. 2003) (no precedent set by establishing quota for hunting of trumpeter swan where agency modified the permit, area, and monitoring requirements over the years and described season as "experimental" and "subject to the normal annual review of status and harvest of the affected populations."). Therefore, plaintiffs have not established a substantial case on the merits with respect to this particular significance factor.

### iv) Controversy

In order to establish the existence of this factor, there must be a "substantial dispute ... as to the size, nature, or effect of the major federal action rather than to the existence of opposition" to a proposal. *Town of Cave Creek v. F.A.A.,* 325 F.3d 320, 331 (D.C.Cir.2003). The size and nature of the challenged Maryland permit are established for the purposes of plaintiffs' motion, in that it allows the state,

among other things, to kill 525 swans. While plaintiffs have identified serious gaps in defendants' assessment of the local effects of the proposed action, they do not appear to have identified any scientific controversy *per se* as to the extent of the effects of killing mute swans on a state-wide and region-wide basis. Therefore, the Court is not persuaded that plaintiffs have made a "substantial case" as to the existence of this factor.

Although the Court is not persuaded as to the existence of the "controversy" and "precedent" factors, it finds that, at a minimum, plaintiffs have raised a "substantial question" as to the existence of at least two factors. Furthermore, the Court adopts the approach of both the Ninth Circuit and several sister courts within this Circuit and finds that the existence of one or more significance factors can justify setting aside a FONSI and remanding either for further consideration of those factors or preparation of an EIS. Accordingly, as in *Animal Protection Institute v. Stanton,* "plaintiffs have a substantial likelihood of success on the merits and demonstrated that [FWS] has failed to make a convincing case for its finding of no significant impact because it ... has failed to consider some of the relevant factors under the CEQ regulations." *Animal Protection Institute v. Stanton,* Civil Action No. 97–2563, Tr. Hr'g Mot. Prelim. Inj. at 60 (December 10, 1997).

### 2. MBTA

■■■ The treaties and conventions underlying the MBTA stipulate that migratory birds may only be killed under "extraordinary conditions," where birds have "become seriously injurious to the agricultural or other interests in any particular community." *Humane Soc'y of the U.S. v. Glickman,* 217 F.3d 882, 885 (D.C.Cir. 2000) ("Article VII of the Treaty contem-

plated that permits allowing the killing of migratory birds would be available in 'extraordinary conditions' when the birds have 'become seriously injurious to the agricultural or other interests in any particular community' "). The MBTA itself provides that "it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, [or] kill ... any migratory bird" unless permitted pursuant to the regulations promulgated by the Secretary of the Interior which allow for "lethal take" under limited circumstances. *Id.;* 16 U.S.C. §§ 703–704. The regulations promulgated pursuant to the MBTA provide that a depredation permit such as the one challenged here can only be issued upon submission of information regarding the "location where the requested permitted activity is to be conducted," as well as a "description of the area where depredations are occurring," the "nature of the crops or other interests being injured," and the "extent of such injury." 50 C.F.R. § 13.12(a)(2); 50 C.F.R. §§ 21.41(b)(1)-(3).

Plaintiffs argue that MDNR's application for a depredation permit failed to meet the requirements for such permits under the MBTA. Pls.' Mot. at 11. They further submit that FWS' failure to ensure that these requirements were met, or explain how it believes they were satisfied, prior to issuing Maryland's permit, constitutes arbitrary and capricious agency action. Pls.' Mot. at 37–38.

#### a) *Area covered by permit*

Plaintiffs contend that defendants' designation of the area in which the permitted activity will be conducted as 15 of 24 counties in Maryland, covering 6000 square miles, without any further information regarding which local swan populations will be targeted and which specific areas (beyond "Chesapeake Bay and Maryland

counties that abut tidal waters") will be reached by the permit runs afoul of these requirements, as it reflects a "regional area," not a "particular area" as required by the regulations. Pls.' Mot. at 32–37; Pls.' Reply at 12–13; MDNR Application at 3.

Defendants counter that MDNR provided specific information in attachments to its March 13, 2003 and July 3, 2003 permit applications, as well as in a July 11, 2003 supplement to its permit application, regarding the precise locations in which it intends to act on its depredation permit. Def.'s Opp'n at 33. It is true that MDNR did provide specific information regarding which public lands would serve as the focus of its swan "removal" activities, *see* March 13, 2003 MDNR permit application at 4, as well as a description of the *types* of areas they would like to render "swan free," *see Mute Swans in Maryland: A Statewide Management Plan* (April 14, 2003), Appendix D (describing proposed "swan free areas" as "[i]mportant SAV [b]eds," SAV transplanting sites, publically owned wetlands, colonial waterbird nesting sites, and black duck nesting sites). However, the permit application itself requests that the scope of the permit remain the entire area covered by the 15 counties that abut Chesapeake Bay and other tidal waters because those are the areas in which mute swans are generally found, and the State maintains that it "cannot say with any greater degree of certainty where [the] exact locations" where swan killing will take place will be. Similarly, it cites to information from prior swan population counts which identify precise locations where swan nests have been found in the past, but does not specify the localized and specific types of damage mute swans are alleged to be causing in those areas, nor the number of birds it intends to take in each of the areas. *Compare Fund for Animals v. Williams*, 246 F.Supp.2d at 40

(noting that each of *three* separate EAs analyzing impacts of proposed hunt of birds protected under MBTA described population level and distribution, breeding habits, migratory path (or lack thereof), and *local economic impacts* ). It appears that such a generalized description of a vast area is not sufficient to meet the requirements set forth in the MBTA regulations.

b) *Extent of injury*

Plaintiffs next argue that defendants failed to adequately document the "extent of the injury" to "crops and other interests" caused by mute swans prior to issuing the permit. In support of their argument, plaintiffs cite to the statements of an MDNR expert who observed that "viewed from a bay-wide perspective, the biomass of SAV being consumed by [a] couple-thousand birds is almost certainly negligible." Pls.' Mot. at 43, Ex. 38, e-mail from Mike Naylor to Edith Thompson, *et al.* (October 18, 2000), Ex. 41, Letter to Bette Stallman from Paul Peditto, Director, Wildlife and Heritage Service, MDNR ("bay-wide impacts of the collective Maryland mute swan population are negligible at current numbers.") (Sep. 23, 2002). In addition, plaintiffs submit that the MDNR itself has acknowledged that it has not completed ongoing scientific research aimed at quantifying the impacts of mute swans on SAV in the Chesapeake. Pls.' Mot. at 35, Ex. 41, Letter from Peditto to Stallman (Sep. 23, 2002). Moreover, plaintiffs correctly point out that Maryland has chosen the areas to be covered by the depredation permit based on where mute swans are most likely to be found, not based on where the extent of the injury associated with their presence is greatest, although defendants do contend that areas of "high swan density" are those in which "significant decreases in SAV abundance

and diversity" occur. *See* Pls.' Reply at 13–14; Hindman Decl. ¶ 18. Finally, plaintiffs particularly challenge FWS' basis for issuing of a permit to kill 525 swans, arguing that the agency articulated absolutely no basis for its selection of that particular number over any other. Pls.' Mot. at 38–39; Pls.' Reply at 20 n. 14.

In light of the above, the Court is persuaded that plaintiffs have presented a "substantial case on the merits" with respect to defendants' non-compliance with MBTA and its regulations, thereby supporting grant of injunctive relief.

### D. *Public interest*

██ Turning to the final factor in the preliminary injunctive relief equation, plaintiffs argue that the public interest weighs heavily in their favor, citing to the public interest in compliance with NEPA. *See Greater Yellowstone Coalition v. Bosworth,* 209 F.Supp.2d 156, 163 (D.D.C. 2002) ("Courts have not hesitated to enjoin an agency action that was taken in violation of NEPA."); *Fund for Animals v. Clark,* 27 F.Supp.2d at 15; *Fund for Animals v. Espy,* 814 F.Supp. at 152 ("a public interest expressed by Congress was frustrated by approval of this proposal, with likely environmental consequences, without NEPA compliance."). They further submit that maintenance of the *status quo* pending adjudication of their claims on the merits serves the public interests set forth in the MBTA.

While defendants identify an equally strong public interest in preservation and restoration of Chesapeake Bay and its natural and commercial resources, *see* MDNR Opp'n at 29–30, ultimately the FWS and MDNR have not met their burden of demonstrating why reduction of the mute swan population in Maryland absolutely *must* begin at this time in order to achieve this long-term goal, as opposed to, say, a year

in the future when the next molting season takes place. Pls.' Mot. at 43, Ex. 41, Letter to Bette Stallman from Paul Peditto, Director, Wildlife and Heritage Service, MDNR ("bay-wide impacts of the collective Maryland mute swan population are negligible at current numbers."); Pls.' Reply at 4, 16–20. FWS will certainly be free to adjust the number of swans Maryland is authorized to take to reflect any resultant population increase, and MDNR has not offered any reason why it cannot engage in additional mitigation activity in order to re-establish the SAV that will be consumed by the 525 swans in question, along with any offspring they give rise to during the pendency of this action.

## V. Conclusion

There is no question that all parties before the Court have the interests of the environment, and particularly of the Chesapeake Bay, at heart. Nevertheless, upon consideration of the factors which courts are directed to weigh when considering whether to grant the extraordinary relief of a preliminary injunction, this Court concludes that plaintiffs have made a compelling showing of irreparable harm, as well as a substantial case on the merits of both their National Environmental Policy Act and Migratory Bird Treaty Act claims. Furthermore, defendants have not succeeded in persuading this Court that they will suffer substantial harm or that the public interest will be adversely affected by the grant of short-term injunctive relief in this case. Accordingly, in order to preserve the *status quo* during the pendency of this action, the Court will essentially speak for the mute swans and issue a preliminary injunction prohibiting the state of Maryland from acting on the mute swan depredation permit issued by the Fish and Wildlife Service on August 11, 2003 by killing any mute swans in the state

of Maryland. Plaintiffs' motion for a preliminary injunction is hereby **GRANTED.**

An appropriate Order accompanies this Memorandum Opinion.